JESSIKA ELLEN STOVER; AKA:
JESSIE E. STOVER,      #28201
ICI-O U/A 381 W. HOSPITAL DR.
OROFINO,   IDAHO         83544

Plaintiff ■ *In Propria Persona*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IDAHO

United States District Court Docket No.: 1:12-cv-00393-CWD

JESSIKA ELLEN STOVER ★ AKA: JESSIE E. STOVER⊕,
*"CLASS OF ONE"*

Plaintiff,

Versus

## CORRECTIONS CORPORATION OF AMERICA (CCA):
JOHN/JANE DOE #001, President of Corrections Corporation of America (CCA);
JOHN/JANE DOE # 002, Vice President of Corrections Corporation of America (CCA);
JOHN/JANE DOE # 003, Operations Manager of Corrections Corporation of America (CCA);
JOHN/JANE DOES # 004-014, Board of Policy Makers for Corrections Corporation of
America (CCA); JOHN/JANE DOES # 015-115;

## IDAHO CORRECTIONAL CENTER  (ICC), (A Subsidiary Company of CCA):
TIMOTHY WENGLER, who replaced Phillip Valdez in 2010, is the Warden of the Idaho
Correctional Center for (CCA); (?) PEREZ, Deputy Warden of ICC; TOM KESSLER, Deputy
Warden of ICC; SHANE JEPSEN (#6669), Chief of Security; JOHN/JANE DOE # 116
(#8537), Security Threat Group Investigator; JOHN/JANE DOE # 117, Unit Manager
Coordinator; BRIAN JOHNSON, West Wing Unit Manager; S. MULEN (#0723), West Wing
Sergeant; (?) VENEM, West Wing Lieutenant; JOHN/JANE DOE # 118, ICC/CCA Security
Staff; JOHN/JANE DOES # 119-130, ICC/CCA Security Staff; CHARLIE FLETCHER,
ICC/CCA Psychiatric Technician; and, M. KERR (#9505), West Wing Counselor; ACEL K.
THACKER ICC, CCHP Health Service Administrator; JOSEPH CARDONA, ICC Health Service
Administrator; LAMBERT, ICC PHYSICIAN; JOHN/JANE DOES # 131 & 132, ICC/CCA
Dental Physicians; and, JOHN/JANE DOES # 133-139, ICC Medical Personnel.

## IDAHO DEPARTMENT OF CORRECTIONS (IDOC):
BRENT D. REINKE, IDOC Director of Prisons; WILL FRUEHLING, IDOC Chief Investigator
of Office of Professional Standards; DAN BROMLY, IDOC Move Coordinator; RENAE P.
JAMES, IDOC Quality Control Coordinator (QCC); JOHN/JANE DOE # 140, IDOC Virtual
Prison Warden; JOHN/JANE DOES # 141-150, IDOC Administrators and Operations
Managers.

## IDAHO STATE CORRECTIONAL INSTITUTION (ISCI):
JOHANNA SMITH, ISCI (Previous), Warden; RANDY BLADES, ISCI (Current), Warden;
HOWARD YORDY, ISCI Deputy Warden; JAY CHRISTENSEN, ISCI Deputy Warden; SHELL
WAMBLE-FISHER, ISCI (Previous) Deputy Warden; GARRETT COBURN, ISCI (Current)

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS ■ Pg. 1

Deputy Warden; (?) BOBBOLO, ISCI (?); JOHN/JANE DOES # 151-156, ISCI Prison Administrators; ASHLEY DOWELL, ISCI Clinical Supervisor; BRIAN N. FARISS, ISCI Psychiatric Treatment Cordinator; (?) BRACKIN, ISCI Behavior Health Unit Psychiatric Technician; RICHARD CRAIG, ISCI Chief Psychologist; SHANE EVANS, ISCI Director, ET & R; JEFF K. KIRKMAN, ISCI Religious Activities Coordinator; R. ALLEN & JOHN/JANE DOES # 163-167, ISCI (Gym) Correctional Officers; V. GREENLAND, ISCI (Current) Behavior Health Unit Sergeant; (?) WINTERS, ISCI (Previous) Behavior Health Unit Sergeant; JOHN/JANE DOES # 174-179, ISCI Behavior Health Unit Correctional Officers; S. WILLIAMS (LAU), ISCI Correctional Officer Sergeant; (?) RHODES, ISCI Correctional Officer Sergeant; JOHN/JANE DOES # 168-188, ISCI Correctional Officer; (?) FINLEY, ISCI Correctional Sergeant of Property; TROY BLACK, ISCI Correctional Officer of Property; (?) SHOEN, ISCI Correctional Officer of Property; (?) STOPH, ISCI Correctional Officer; (?) ROMWELL, ISCI/BHU Correctional Officer; and, (?) MAGON & JOHN/JANE DOES # 180 & 181, ISCI Gym/Pendyne Correctional Officers;

### CORIZON MEDICAL SERVICES (CMS):
### (AKA: CORRECTIONAL MEDICAL SERVICES (CMS):

RICH CARTNEY, CMS Medical Personnel; CONNIE SMOCK, CMS Medical (Registered Director of Nurses); JOHN/JANE DOES # 182 & 183 ("183" #0083), CMS Medical Administrators; JOHN/JANE DOES # 184 (LAMUUUUUMEN #7102), CMS; JOHN/JANE DOE # 185, CMS Medical Director; RONA SIEGERT, CMS Registered Nurse and IDOC Health Service Director; KAREN WALKER, CMS Registered Nurse of Clinical Programs; SCOTT LOSSMAN, CMS Medical Physician; (?) VALLEY, CMS Physicians Assistant; (?) RICHARDSON, CMS Medical Personnel; THERESA WILLIAMS, CMS Medical Personnel; JOHN/JANE DOE # 186 (#0996), CMS Medical Personnel; L. BROWN, CMS Medical Personnel; (?) GROFF, CMS Medical Personnel; and, JOHN/JANE DOES # 187-200, CMS Medical Personnel.

Defendant(s).

## AMENDMED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS
### *WITH JURY DEMAND*

**COMES NOW,**  JESSIKA ELLEN STOVER ★ AKA: JESSIE E. STOVER, a transgender prisoner, who having legal cause, as a *"Class of One"*, does hereby, submit this Amended Complaint for Civil Rights Violations against the above named defendants.

★ I. INTRODUCTION ★

001.  Plaintiff, a Transgender individual, that is diagnosed with "Gender Identity Disorder", complains of being the subject of a number of Constitutional Violations, while in the care, custody and control of the above named defendants, and that such violations are set forth as follows:

## A.     SEXUAL AND PHYSICAL ASSAULT ■ ICC:

002.     Plaintiff's first complaint, is that she was Deprived of Protection from Sexual and Physical assaults at the hands of Security Threat Group "Gang" Members while participating in a Rehabilitation Program at the Idaho Correctional Center that is operated by a private entity known as Corrections Corporation of America, which violated Plaintiff's right to be Secure in their Persons Clause and Free from Cruel and Unusual Punishment Clause, pursuant to the: Fourth, Eighth and Fourteenth § 1 Amendments, of the United States Constitution.

## B.     PHYSICAL ASSAULT ■ ISCI:

003.     Plaintiff's second complaint, is that she was again Deprived of Protection from Physical Assault at the hands of a Security Threat Group Member, while being housed in the Mental Health Facility, (known as Behavior Housing Unit), at the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, which violated Plaintiff's right to be Secure in thier Persons Clause and Free from Cruel and Unusual Punishment Clause, pursuant to the: Fourth, Eighth and Fourteenth § 1 Amendments, of the United States Constitution.

## C.     SEXUAL HARASSMENT BY SECURITY GUARDS ■ ISCI:

004.     Plaintiff's third complaint, is that she was Deprived of Protection from Sexual Harassment and Invasion of Privacy by a number of Correctional Guards, while participating in a Recreation Program, (known as the Gym/Ballfield), at the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, which violated Plaintiff's right to be Secure in thier Person Clause, the right to be Secured from Unreasonable Searches Clause and Free from Cruel and Unusual Punishment Clause, pursuant to the: Fourth, Eighth and Fourteenth § 1 Amendments, of the United States Constitution.

## D.     MEDICAL INADEQUACY ■ ICC:

### 1.     Inadequate Dental Care;

005.     Plaintiff's fourth complaint, is that she was subjected to Inadequate Dental Care paramount to Deliberate Indifference, while in the care, custody and control of the Idaho Correctional Center that is operated by a private entity known as Corrections Corporation of

America, by being denied and delayed from having her # 24 tooth completed, which violated Plaintiff's right to be Free from Cruel and Unusual Punishment Clause, pursuant to the: Eighth and Fourteenth § 1 Amendments, of the United States Constitution.

2.  **Denial of Adequate Care ■ (Proper Undergarments);**

006.  Plaintiff's fifth complaint, is that she was again subjected to Inadequate Medical Care paramount to Deliberate Indifference, while in the care, custody and control of the Idaho Correctional Center that is operated by a private entity known as Corrections Corporation of America, by being deprived Medically Required Undergarments (i.e. seamless Briefs), which violated Plaintiff's right to be Free from Cruel and Unusual Punishment Clause, pursuant to the: Eighth and Fourteenth § 1 Amendments, of the United States Constitution.

**E.     MEDICAL INADEQUACY ■ ISCI:**

1.  **Denial of Adequate Care ■ (Proper Undergarments Continued);**

007.  Plaintiff's sixth complaint, is that she was for a third time subjected to Inadequate Medical Care paramount to Deliberate Indifference, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by being deprived Medically Required Undergarments (i.e. seamless Briefs and Training Bras), by a private entity known as Corizon Medical Service (i.e. Correctional Medical Services), which violated Plaintiff's right to be Free from Cruel and Unusual Punishment Clause, pursuant to the: Eighth and Fourteenth § 1 Amendments, of the United States Constitution.

2.  **Medical Delay and Inadequate Treatment:**

a)  *High Blood Pressure Medication;*

008.  Plaintiff's seventh complaint, is that she was for a fourh time subjected to Inadequate Medical Care paramount to Deliberate Indifference, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by being deprived and/or delayed Medically Required High Blood Pressure Medication for two (2) months, by a private entity known as Corizon Medical Service (i.e. Correctional Medical Services), which violated Plaintiff's right to be Free from Cruel and Unusual Punishment Clause, pursuant to the: Eighth and Fourteenth § 1 Amendments, of the United States

■ CASE NO.: 1:12-cv-00393-CWD [Document 10] Filed 10/22/12 5 of 216 ■

Constitution.

### b) *Wrong Medication;*

009.    Plaintiff's eighth complaint, is that she was for the fifth time subjected to Inadequate Medical Care paramount to Deliberate Indifference, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by being provided: (1) Being Provided the Wrong Medication to treat her Gender Identity Disorder; and (2) Being Provided the Wrong Medications to treat side effects pertaining to her High Blood Pressure Medications, by a private entity known as Corizon Medical Service (i.e. Correctional Medical Services), which violated Plaintiff's right to be Free from Cruel and Unusual Punishment Clause, pursuant to the: Eighth and Fourteenth § 1 Amendments, of the United States Constitution.

## F.    MENTAL HEALTH INADEQUACY ■ ISCI:

### 1.    Gender Identity Disorder Treatment;

010.    Plaintiff's ninth complaint, is that she was the subject of Inadequate Mental Health Care paramount to Deliberate Indifference, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by being deprived Proper and Adequate Mental Health Treatment Medically Required for Purpose of Rehabilitation of Gender Identity Disorder, by (1) Forcing her to live, act and portray herself as a Male; and (2) by its blanketed policy in prohibiting her from the right to Self Expression as a Feminine Female, which violated Plaintiff's rights to Self Expression Clause and Freedom from Cruel and Unusual Punishment Clause, pursuant to the: First, Eighth, Ninth and Fourteenth § 1 Amendments, of the United States Constitution.

## G.    RELIGIOUS PRACTICE ■ ISCI:

### 1.    Denial of Practice;

011.    Plaintiff's tenth Complaint, is that she was subjected to the Deprivation of the Practices of her Religious Freedoms, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by being deprived the equal abilities to perform Native American Religious Ceremonies as is provide to other

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS ■ Pg. 5

Native Americans, which violated Plaintiff's rights the Free Exercise Clause, pursuant to the: First, and Fourteenth § 1 Amendments, of the United States Constitution.

## H.    FREE SPEECH ■ ISCI:

### 1.    Chill of Speech by Threats of Retaliation;

012.    Plaintiff's eleventh Complaint, is that she was subjected to the Chilling of her right of the Exercise of her Free speech, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by being verbally disciplined and threaten by disciplinary confinement for use of fowl language, which violated the Free Speech Clause, pursuant to the: First, and Fourteenth § 1 Amendments, of the United States Constitution.

## I.    DEPRIVATION AND PROTECTION OF PROPERTY ■ ISCI:

### 1.    Deprivation;

013.    Plaintiff's twelfth Complaint, is that she was subjected to a Deprivation of her Personal Property Equal to that of other similarly situated Individuals, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by being deprived of her Personal Property in Retaliation for reporting a Sexual and Physical Assault, which violated the Free Speech Clause, Illegal Search and Seizure Clause, Right to Due Process Clause; Freedom from Cruel and Unusual Punishment Clause and Right to Equal Protection of Laws Clause, pursuant to the: First, Fourth, Fifth, Eighth and  Fourteenth § 1 Amendments, of the United States Constitution.

### 2.    Failure to Protect:

#### a)    From Damage;

014.    Plaintiff's thirteenth Complaint, is that she was subjected to a Deprivation of the Protection of her Personal Property, while such Personal Property was in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by having said Personal Property Items Lost and or Damaged, while it was in Prison Officials Possession, which violated the, Right to Due Process Clause; Freedom from

Cruel and Unusual Punishment Clause and Right to Equal Protection of Laws Clause, pursuant to the: Fourth, Fifth, Eighth and   Fourteenth § 1 Amendments, of the United States Constitution.

### b)   From Theft;

011.    Plaintiff's fourteenth Complaint, is that she was subjected to a Deprivation of the Protection from Theft of her Personal Property, while in the care, custody and control of the Idaho State Correctional Institution, operated by the Idaho Department of Corrections, by having said Personal Property Items Stolen from her Cell after a Correctional Officer Opened her Secured Door and allowed another Prisoner to Enter and Rob her, which violated the, Right to Due Process Clause; Freedom from Cruel and Unusual Punishment Clause and Right to Equal Protection of Laws Clause, pursuant to the: Fourth, Fifth, Eighth and   Fourteenth § 1 Amendments, of the United States Constitution.

```
★   II.   JURISDICTION   ★
```

001.    This action arises under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution,   which is actionable by this Courts Jurisdiction pursuant to Title(s): 42 U.S.C. § 1983; 28 U.S.C. § 1331; § 1332(a)(c)(1)(d)(1) ect. seq.; and, § 1343(a)(3) and (4).

002.    This Court further retains venue pursuant to Title: 28 U.S.C. § 1391(b), in that Plaintiffs' claims arose, within this District.

003.    Plaintiff invokes Title 28 U.S.C. § 1367, which provides for "supplemental" jurisdiction over such claims.

004.    Plaintiff invokes further jurisdiction pursuant to Title{s}: 42 U.S.C. § 12101 *et seq.*, 42 U.S.C. § 12102(2)(b), 42 U.S.C. § 12132, 42 U.S.C. § 12132(1)(B), Federal Americans with Disability Act (ADA); 29 U.S.C. § 794, 42 U.S.C. §12131(2), Section 504 of the Rehabilitation Act; 42 U.S.C. § 2000bb, 42 U.S.C. § 2000bb-1, 42 U.S.C. § 2000cc5(7)(A), 42 U.S.C. § 2000cc-1, 42 U.S.C. § 2000cc5(4)(A), 42 U.S.C. § 2000cc5(4)(B), 42 U.S.C. § 2000cc3(c), 42 U.S.C. § 2000bb-2(1), 42 U.S.C. § 2000bb-2(4), 42 U.S.C. § 2000cc(a)(1), 42 U.S.C. § 2000cc-3(e), 42 U.S.C. § 2000cc-3(g), Religious Freedom Restoration Act (RFRA),  and Religious Land Use and Institutionalized Persons Act (RLUIPA); and, 42 U.S.C. § 1985, 1986, Civil Rights Conspiracy Claims;

005.    Plaintiff invokes Rule 23, of the Federal Rules of Civil Procedure, whereby securing this action as a *"Class of One"*, equal protection claims, as defined by Villiage of Willowbrook v. Olech, *528 U.S. 562, 564-65, 120 S.Ct. 1073 (2000)*.

---

## ★ III.   STATE CREATED LIBERTY INTEREST ★

---

001.    Plaintiff states that Idaho Code 18-313, which reads: Protection of person of convict. — The person of a convict sentenced to imprisonment in the state prison is under the protection of the law, and any injury to his person, not authorized by law, is punishable in the same manner, as if he were not convicted or sentenced. [I.C., 18-313, as added by 1972, ch. 336, 1, p. 844]," creates a "Liberty Interest" in procedural and remedy in the same form as if injured party were not a prisoner.

002.    In furtherance pursuant to Article I § 18, of the State of Idaho Constitution, which reads: "Justice to be freely and speedily administered. — Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale,, denial, delay, or prejudice.", provides Plaintiff herein the right to pursue this action. See, Idaho Code § 18-313.

---

## ★ IV.  PARTIES ★

---

## 1.    PLAINTIFF:

001.    Named Plaintiff Jessika Ellen Stover; Aka: Jessie E. Stover, is an adult citizens of the United States and a "Transgender" prisoners, suffering with Gender Identity Disorder (GID), who is incarcerated under the jurisdiction of the Idaho Department of Corrections.  Plaintiff is currently being housed at the Idaho Correctional Institution – Orofino (ICI-O).  However, during the incident complained of herein, Plaintiff was incarcerated at the Idaho Correctional Center (ICC), which is a State Facility being operated by a private prison firm known as Corrections Corporation of America (CCA), while participating in a Rehabilitation Program. Plaintiff can be reached physically at: ICI-O Housing Unit A, 381 W. Hospital Dr., Orofino, Idaho 83544.

## 2.     CCA ■ DEFENDANTS:

002.   The defendants are: **CORRECTIONS CORPORATION OF AMERICA (CCA)**: *JOHN DOE #001*, President of Corrections Corporation of America (CCA); *JOHN DOE # 002*, Vice President of Corrections Corporation of America (CCA); *JOHN DOE # 003*, Operations Manager of Corrections Corporation of America (CCA); *JOHN DOE # 004-014*, Board of Policy Makers for Corrections Corporation of America (CCA); *JOHN DOE # 015-115*. (CCA) is a for-profit business incorporated under the laws of Maryland.  As part of its enterprises, (CCA) operates (ICC).  Each of these defendants can be located at: 10 Burton Hills Boulevard, Nashville, TN 37215; and, Each of these defendants are hereby sued in their individual and official Capacity.

## 3.     ICC ■ DEFENDANTS:

003.   The defendants are:  **IDAHO CORRECTIONAL CENTER   (ICC), (A Subsidiary Company of CCA)**:  TIMONTHY WENGLER, who replaced Phillip Valdez in 2010, is the Warden of the Idaho Correctional Center for (CCA); (?) PEREZ, Deputy Warden of ICC; TOM KESSLER, Deputy Warden of ICC; SHANE JEPSEN (#6669), Chief of Security; JOHN/JANE DOE # 116 (#8537), Security Threat Group Investigator; JOHN/JANE DOE # 117, Unit Manager Coordinator; BRIAN JOHNSON, West Wing Unit Manager; S. MULEN (#0723), West Wing Sergeant; West Wing Lieutenant, (?) VENEM; JOHN/JANE DOES #118-130, ICC/CCA Security Staff; CHARLIE FLETCHER, ICC/CCA Psychiatric Technician; and, M. KERR (#9505), West Wing Counselor; ACEL K. THACKER ICC, CCHP Health Service Administrator; JOSEPH CARDONA, ICC Health Service Administrator; LAMBERT, ICC PHYSICIAN; JOHN/JANE DOES # 131 & 132, ICC/CCA Dental Physicians; and, JOHN/JANE DOES # 133-139 ICC, Medical Personnel.  Each of these defendants can be located at: 14600 South Pleasant Valley Road, Kuna, Idaho 83634; and, Each are hereby sued in their individual and official capacity.  Defendants mailing address is: ICC Medical Department, at: P.O. Box 70010, Boise, Idaho 83707.

## 4.     IDOC DEFENDANTS:

004.   The defendants are: **IDAHO DEPARTMENT OF CORRECTIONS (IDOC)**:  BRENT D. REINKE IDOC, Director of Prisons; WILL FRUEHLING IDOC, Chief Investigator of Office of Professional Standards; DAN BROMLY IDOC, Move Coordinator; RENAE P. JAMES IDOC, Quality Control Coordinaor (QCC); JOHN/JANE DOE # 140, IDOC Virtual Prison

■ CASE NO.: 1:12-cv-00393-CWD [Document 10] Filed 10/22/12 10 of 216 ■

Warden;   JOHN/JANE DOES # 141-150 IDOC, Administrators and Operations Managers.
Each of these defendants can be located at: 1299 North Orchard, Suite 110, Boise, Idaho
83706; and, Each are hereby sued in their individual and official capacity.  Defendants mailing
address is: The same as above.

## 5.   ISCI DEFENDANTS:

005.   The defendants are: **IDAHO STATE CORRECTIONAL INSTITUTION (ISCI)**:
JOHANNA K.SMITH, ISCI (Previous), Warden; RANDY BLADES, ISCI (Current), Warden;
HOWARD YORDY ISCI, Deputy Warden; SHELL WAMBLE-FISHER ISCI, (Previous)
Deputy Warden; GARRETT COBURN ISCI, (Current) Deputy Warden; (?) BOBBOLO ISCI,
(?); JOHN/JANE DOES # 151-156, ISCI Prison Administrators; ASHLEY DOWELL ISCI,
Clinical Supervisor; BRIAN N. FARISS ISCI, Psychiatric Treatment Cordinator; (?) BRACKIN
ISCI, Behavior Health Unit Psychiatric Technician; RICHARD CRAIG ISCI, Chief Psychologist;
SHANE EVANS ISCI, Director, ET & R; JEFF K. KIRKMAN ISCI, Religious Activities
Coordinator; R. ALLEN & JOHN/JANE DOES # 163-167, ISCI (Gym) Correctional Officers;
V. GREENLAND ISCI, (Current) Behavior Health Unit Sergeant; (?) WINTERS ISCI,
(Previous) Behavior Health Unit Sergeant; JOHN/JANE DOES # 174-179, ISCI Behavior
Health Unit Correctional Officers; S. WILLIAMS (LAU) ISCI, Correctional Officer Sergeant;
RHODES, ISCI Correctional Officer Sergeant; JOHN/JANE DOES # 168-188 ISCI,
Correctional Officer; (?) FINLEY ISCI, Correctional Sergeant of Property; TROY BLACK
ISCI, Correctional Officer of Property; (?) SHOEN ISCI, Correctional Officer of Property; (?)
STOPH ISCI, Correctional Officer; ROMWELL, ISCI/BHU Correctional Officer; and, MAGON
& JOHN/JANE DOES # 180 & 181, ISCI Pendyne Correctional Officers.   Each of these
defendants can be located at: 13500 South Pleasant Valley Road, Kuna, Idaho 83634; and,
Each are hereby sued in their individual and official capacity.  Defendants mailing address is:
ISCI Administration Building, at: P.O. Box 14, Boise, Idaho 83707.

## 6.   CMS DEFENDANTS:

006.   The   defendants   are: **CORIZON   MEDICAL   SERVICES   (CMS)**: (AKA:
CORRECTIONAL MEDICAL SERVICES (CMS):  RICH CARTNEY, CMS Medical Personnel;
CONNIE SMOCK, CMS Medical (Registered Director of Nurses); JOHN/JANE DOES # 182 &
183   ("183"   #0083),   CMS   Medical   Administrators;   JOHN/JANE   DOES   #   184
(LAMUUUUUMEN #7102), CMS; JOHN/JANE DOE # 185, CMS Medical Director; RONA
SIEGERT, CMS Registered Nurse and IDOC Health Service Director; KAREN WALKER, CMS

■ CASE NO.: 1:12-cv-00393-CWD [Document 10] Filed 10/22/12 11 of 216 ■

Registered Nurse of Clinical Programs; SCOTT LOSSMAN, CMS Medical Physician; (?) VALLEY, CMS Physicians Assistant; (?) RICHARDSON, CMS Medical Personnel; THERESA WILLIAMS, CMS Medical Personnel; JOHN/JANE DOE # 186 (#0996), CMS Medical Personnel; L. BROWN, CMS Medical Personnel; GROFF, CMS Medical Personnel; and, JOHN/JANE DOES # 187-200, CMS Medical Personnel, is a for-profit business incorporated under the laws of (a foreign state). Each of these defendants can be located at: 13500 South Pleasant Valley Road, Kuna, Idaho 83634; and, Each are hereby sued in their individual and official capacity. Defendants mailing address is: ISCI Medical Building, at: P.O. Box 14, Boise, Idaho 83707.

## ★ V. GENERAL STATEMENT OF FACTS ★

1.    **IDAHO CORRECTIONAL CENTER ■ ICC:**

001.    ICC was constructed on state-owned land in Kuna, Idaho, with public tax funds. ICC is operated under the jurisdiction of the Idaho Department of Corrections (IDOC). IDOC entered into a contract with CCA under which CCA is paid to manage and operate ICC on a day-to-day basis.

002.    Until recently, ICC housed approximately the same number of prisoners as does the Idaho State Correctional Institution (ISCI), nearly 1,500 male prisoners. Yet, during 2008 and 2009, three times as many prisoner-on-prisoner assaults occurred at ICC than at ISCI.

003.    The number of assaults actually occurring at ICC is considerably higher then reported, perhaps three times as high. Firstly, ICC deliberately fails to document many assaults. Secodly, many victims of prisoner assault choose to conceal the incident out of fear of reprisal by prisoners for being a "snitch." Indeed, in a newspaper article dated April 5, 2009, an IDOC official, discussing the level of violence at ICC, told a reporter for the Associated Press: "It is fair to estimate that for every one incident we know of, there may be two that we do not."

004.    There are at least fourteen reasons why violence at ICC far exceeds the violence in other Idaho facilities. They are: (a) deliberate indifference of many ICC employees, including the named defendants; (b) inadequate training of staff; (c) inadequate number of staff; (d) inadequate supervision of staff; (e) the promotion of a culture throughout the facility that relies on the degradation, humiliation, and subjection of prisoners, thereby creating excessive and unnecessary tension, stress, and frustration within the prisoner population; (f) failure to adequately investigate acts of violence, including a failure to track the number and location of

◼ CASE NO.: 1:12-cv-00393-CWD [Document 10] Filed 10/22/12 12 of 216 ◼

assaults so as to take appropriate remedial action; (g) failure to discipline those guards whose misconduct or malfeasance contributed to an act of violence, including those guards who deliberately arranged assaults or who refused to remove a prisoner from a clearly dangerous environment; (h) placement of vulnerable prisoners with predatory prisoners; (i) failure to isolate or properly discipline prisoners who attack other prisoners; (j) maintaining a "code of silence" such that staff are discouraged from reporting errors, including their own errors, that caused or contributed to an act of prisoner violence; (k) the deliberate reliance on--and encouragement of--prisoner violence as a management tool; (l) overcrowding at ICC, which results in increased tension and anxiety with the prisoner population, inhibits proper supervision, and reduced the number of unused beds to which prisoners in dangerous situations may be moved to in an emergency; (m) inadequate grievance procedures in which prevent prisoners from submitting confidential complaints; and (n) the breach of prisoner safety, when security staff inform the perpetrators of whom is complaining about their conduct.

005.    ICC is understaffed.  At times there are only two guards supervising more than 250 prisoners in the North Wing Units and only two for more than 350 prisoners in the West Wing Units.

006.    Defendants may claim that the level of staffing at ICC is consistent with standards set by the American Correctional Association (ACA).  However, ACA standards recognize that where, as at ICC, training of staff is deficient, there is a high turnover rate, and violence is rampant in the prisoner population, then more staff is necessary.  Thus, ICC is understaffed.

007.    According to a Class Action Lawsuit filed by ACLU, on behalf of prisoners at ICC, ACLU spoke with "numerous former employees of ICC, including Michele Slay, Tedi Hernandez, Creig Smith, and Tammy McCall.  All of them agree that ICC is understaffed. All of them also agree that as a result of Defendant' deliberate indifference, prisoner-on-prisoner violence at ICC is much higher than is should be."

008.    Training academies in Idaho instruct correctional officers and counselors to treat offenders with professionalism and courtesy and  seek to accommodate their legitimate needs. In a report issued in January 2010 by the Office of Performance Evaluations of the Idaho Legislature, "Operational Efficiencies in Idaho's Prison System" (hereinafter, "Legislative Report"), is expressly noted:  "The Department of Correction's mission is to protect the public while maintaining a professional environment that results in a mutual respect between staff and inmates." (P.21).

009.    At ICC, in contrast, guards are encouraged to berate, humiliate, and degrade prisoner, and they frequently yell and swear at them.  Indeed, employees who relate to

■ CASE NO.: 1:12-cv-00393-CWD {Document 10} Filed 10/22/12 13 of 216 ■

prisoners in a professional and courteous manner are ostracized by fellow employees and by supervisors and told that they have been "compromised."

010.     The net result of this oppressive, degrading, and dehumanizing behavior by staff is the creation of a hostile, frustrated, and angry set of prisoners who often resort to violence against other prisoners.  Many guards not only encourage prisoner violence but manipulate it to their own ends.

011.     For instance, a favorite tactic of ICC employees is to threaten a prisoner with placement in a housing unit where that prisoner is likely to be assaulted unless the prisoner consents to become an informant for the administration.  Those prisoners' who do make complaints are subjected to further violence because the staff often inform the perpetrator of the fact that he was "rated-out" by another prisoner, often giving up the prisoner's name.

012.     This is a cruel tactic.  Prisoners who are found to be informants by other prisoners are routinely assaulted.  See Benefield v. McDowell, 241 F.3d 1267 (10th Cir. 2001).  This tactic coerces prisoners into placing themselves in a substantial risk of severe injury.  They must choose between two options, both of which are inherently dangerous:  become an informant, or be placed in a housing unit where they are likely to be assaulted.

013.     According to the ACLU's Complaint, "Ms. Slay will testify that on numerous occasions she observed prisoners, often in tears, begging the unit manager Norma Rodriguez not to follow through with her threat to place them in a housing unit where Rodriguez knew they would be assaulted.  Prisoners would often fabricate stories that incriminated other prisoners just to satisfy Rodriguez's demands that they become informants.  Those prisoners who refused to comply with Rodriguez's requests, Ms. Slay observed, were often deliberately placed by Rodriguez in a housing unit which they would likely be assaulted."

014.     Also, According to ACLU's Complaint, "Ms. Slay was present when Philip Valdez employed that same tactic.  Valdez told prisoner that unless he became an informant, the prisoner would be sent to housing unit in which prisoners who committed his type  of crime were usually assaulted.  Valdez told the prisoner: "You know you will get hurt there.""

015.     The ACLU states in their Complaint that: "Valdez and Rodriguez  were aware at the time they participated in this tactic that prisoners that inform on other prisoners are at risk of being assaulted."

016.     Administrative officials, including the previous Warden, Valdez and Unit Manager Rodriguez, rely on violent prisoners to enforce their threats.  A symbolic relationship exist between certain staff and natoriously violent prisoners.  This is evident by the fact that guards persistently send vulnerable prisoners to live near prisoners who are predators, and when these predators commit assaults, they receive mild punishment, and often no punishment.  For instances, a STG Member assaulted another prisoner named Taylor, went

to segregation and then a few weeks latter was placed back in the same living area, where he assaulted yet another prisoner, as well as committing other criminal acts, as explained below.

017.    Some guards at ICC make no pretense of hating sex offenders, and their supervisors do nothing to stop them from acting on their hatred.  The prevailing culture at ICC permits them to express their hatred openly.  "Ms. Slay advised the ACLU that she would testify that one guard routinely berated sex offenders and told one prisoner that he "should be shot.""

018.    In further support of Plaintiff's claims relating to the violent and abusive conditions at ICC, Plaintiff offers an Exhibit 0001, herein, as other preventable assaults at ICC Page 13 through 74, Case 1:09-cv-00010-BLW (Document 71) Second Amended Complaint, Filed 06/30/10 before the United States District Court of Idaho.

019.    It is for these reasons and others stated below that Plaintiff was placed into a dire situation in which he was physically and sexually assaulted by STG Members, while participating in a Rehabilitation Program in the West Wing of ICC.

020.    In March of 2010, two days after ACLU filed their amended complaint, CCA terminated Philip Valdez, as the Warden at ICC, and Timothy Wengler took his place.

## A.    DEFENDANT'S DELIBERATE INDIFFERENCE:

021.    Evidence of Defendants' deliberate indifference to prisoner health and safety is copious and overwhelming.  First, CCA refuses to provide funds for, and previous Warden Valdez, as well  as the current Warden Wengler, refuses to hire and train, a sufficient number of correctional officers.  It is impossible for ICC to provide prisoners with adequate protection from assault--or to timely intervene when an assault has commenced--with a few guards as ICC has on its staff.

022.    Second, the training that ICC provides to person seeking a position as a guard is inadequate and ineffective.   Former employees can testify at trial that during final examinations, answers to questions are sometimes written on the board, suggested or even given by the examiners, and that applicants rarely flunk the exam no matter how incompetent they may be.

023.    Third, CCA fails to require, and Defendants Valdez, Wengler, Kesseler refused to ensure, that prisoner assaults will be adequately investigated in order to determine what steps should be taken to prevent future assaults, and to determine whether misconduct or malfeasance by a guard caused or contributed to the assault.

024.    Fourth, CCA and Defendants Valdez, failed to ensure that those guards whose malfeasance or misconduct caused or contributed to prisoner violence will be disciplined or retrained.   Consequently, guards act with impunity even when they deliberately place

prisoners in a housing unit where they are likely to be assaulted; when they refuse to remove prisoners from housing units when these prisoners report having been threatened with assault; and when they negligently (or perhaps deliberately) open the wrong doors, thereby allowing prisoners to assault one another.

025.   Fifth, Defendants CCA Administrators as well as, Warden Valdez had known for years that ICC prisoners face significant and unnecessary risk of injury from assault, and yet continued to refuse to take reasonable measures to abate that violence.  During the years of 2007 and 2010 Defendant Valdez had read numerous prisoner grievances complaining about assaults; has seen medical reports describing serious injuries that prisoners have suffered from assaults; has spoken with many prisoners who have been assaulted; has read media reports issued in 2008 and 2009 identifying ICC as a grossly violent facility; and has spoken with staff who have complained about the level of violence at ICC.  Yet Defendant Valdez has permitted and Defendant Warden Wengler continues to permit a reign of terror, violence, and intimidation to pervade ICC.

026.   Sixth, ICC maintains its own in-house medical unit, and it is obvious that ICC-- under the direction and instruction of CCA and Defendants Valdez and Wengler--operated this unit is such a depraved manner that its intention is to *conceal* injuries, not treat them. For instance, CCA and Defendant Valdez had established a policy and practice of not taking x-rays of the severe injuries suffered by assault victims.  This way, (a) ICC saves money (at the expense of prisoners who needed urgent medical care) by not taking x-rays and not hiring medical staff to read the x-rays, and (b) ICC is able to conceal the extent of injures suffered by the victims of assault.

027.   Seventh, ICC-under the direction and instruction of previous Defendant Warden Valdez--had a policy and practice of refusing to refer for prosecution the perpetrators of prisoner assaults, except in very rare situations.  This policy and practice is motivated by a desire to conceal the carnage that is occurring at ICC.  This policy and practice encourages violent prisoners to assault other prisoners because they know they can do so with relative impunity.

028.   Eighth, previous Defendant Warden Valdez perpetuates a "code of silence", which is continued with the current Defendant Warden Wengler, at ICC.  This discouraged the reporting of official misconduct.  These Defendant had given staff no training or any encouragement to report misconduct committed by staff.  To the contrary, those officers who reported mistakes committed by officers were retaliated against by these Defendants Valdez, Wengler and other staff.

029.   Ninth, Defendants Valdez and current Warden Wengler either promulgated or knew about and have acquiesced in the policy and practice of issuing a Disciplinary Offense Report

(DOR) to the victims of assaults.  This practice helps conceal the fact that guards failed to protect the victims from attack.  Victims are frequently charged with "fighting" or "mutual combat" even when they were blind-sided by their assailants.  These DOR's, in addition to exposing these prisoners to disciplinary punishment by ICC, are taken into consideration by the Idaho Commission on Pardons and Parole in determining that prisoner's parole eligibility. As a result, these victims of assault are being denied parole based on DOR's that should never have been issued in the first place.

030.    Tenth, ICC, in order to maximize its profits, generally operates at or above its operating capacity.  As noted in the 2010 Legislative Report, ICC's population in November 2009 was 111 percent (2,021 prisoners) of its operating capacity of 1,821 prisoners.

This predicament, although profitable for CCA, is dangerous to prisoners.  For instance, having a small number of empty beds makes it difficult to quickly move prisoners away form a dangerous environment.  As the Legislative Report notes: "When prisons operate at or near capacity, the ability to safely manage population growth or contingencies such as emergencies or serious incidents is reduced." (p.8).

031.    In short, Defendants, Valdez's and Wengler's, have enacted unwritten policies and practices that foster violence and fail to reduce violence, and they have taken the position to turn-a-blind-eye approach to assaults.  As a result of defendants, Valdez's and Wengler's, failure to porperly control and spervise his subordinates, to hire and train enough staff, and take reasonable steps to prevent violence, which these defendants have condoned, acquiesced in, and promoted the carnage occurring at ICC.

032.    The failures described above continue to this day, placing all prisoners of ICC at unnecessary and substantial risk of being assaulted by other prisoners.


**B.      PHYSICAL LAYOUT OF ICC:**


033.    ICC was opened in 2000 and designed to hold approximately 1250 prisoners. However, in 2006-2007, bunks were added to many existing open dormitories, thereby increasing the population of the prison by nearly 200 prisoners (and decreasing the space many of them were provided in their "cubicles" and the day rooms).  In 2009, Pods D, E, and F were added to the existing structure, and a stand-alone building known as the PIE Building, which was the industries building, was converted into more open dormitories, allowing CCA to maximize it's capacity to approximately 2000 prisoners.

034.    North Wing of ICC contains four Units, each of which contains three Pods.  The Pods are grouped A, B, C; D, E, F; J, K, L, and G, H, I.  There is one Pod Control for each Unit.

035.    West Wing of ICC contains two Units of six Pods each: M, N, O, P, Q, R, and S, T, U, V, W, X.

## C.    THE LOSS AND DESTRUCTION OF PRISONER CONCERN FORMS:

036.    Most of the prisoners whose assaults are summarized in Plaintiff's Exhibit 0001, (Pages 13-74 of Case No. 1:09-cv-00010-BLW - Document 71 - Filed 06/30/10), who submitted written Concern Forms, (which will be obtained in discovery), to guards prior to their assaults, pleading for help.  The vast majority of these forms were never answered.

037.    It is a common practice of ICC staff to disregard--and often discard--Concern Forms.  Several former employees of ICC can testify at trial that they frequently saw Concern Forms in the trash that had been discarded by staff.

038.    Staff would also return the concern form to the prisoner and attempt to persuade the prisoner that it was in the prisoner's best interest to leave the matter alone, often refusing to even sign the Concern Forms.

## 2.    IDAHO STATE CORRECTIONAL INSTITUTION ■ ISCI:

039.    ISCI was contructed in the 1970's on state-owned land in Kuna, Idaho, with public funds.  ISCI is operated under the jurisdiction of the state of Idaho through the Idaho Department of Corrections.  ISCI was originally designed to house approximately 318 prisoners which has steadily been increased from the early 1980's to the current population of over 1700 prisoners.

## A.    DEFENDANT'S DELIBERATE INDIFFERENCE:

040.    As a result to the overcrowding, a prisoner named Walter Balla brought suit in 1981 against the prison.  The Balla case has continued to be litigated in the U.S. District Court, throughout the past thirty years, and was recently litigated once again.  See, Balla v. Board of Corrections, U.S. District Court of Idaho No. CV-81-1165.

041.    Within the litigation of this case, the court appointed, in 2011 a Special Masters named Mark Stern, who investigated and wrote a Report regarding the concerns of the Medical and Mental Health Facilities at ISCI.  Plaintiff will admit this report, once obtained

during discovery.

042.    The Medical Facility at ISCI is operated by defendants Corizon Medical Services (formally known as Correctional Medical Services).

043.    Suffice to say the "Stern Report", implies that Deliberate indifference exist at ISCI regarding Medical and Mental Health Care and Treatment.

## ★ VI. FACTS TO THE CLAIMS ★

001.    That Plaintiff herein above, a person over the age of eighteen years, and competent to give forth sworn testimony before this court and or the United States Congress;

002.    That Plaintiff is a diagnosed individual, with Gender Identity Disorder, ("GID"), having been so diagnosed by a Board Certified Licensed Psychologist;

003.    That Plaintiff, while not making a commission of receiving proper medical treatment, has been receiving cross-gender hormonal therapy since March of 2011;

004.    That Plaintiff, was transferred, on December 30, 2010, to the IDOC Mental Health Unit at the Idaho State Correctional Institution ("ISCI"), after having been a victim of sexual assault by certain Security Threat Group members while attending a rehabilitation program at the Idaho Correctional Center ("hereinafter ICC"), which is operated and ran by a private prison entity, known as Correctional Corporation of America ("hereinafter CCA");

005.    That Plaintiff, as a result of undergoing Cross-gender-hormone therapy, was restricted to the Mental Health Unit until May of 2012, and was only allowed to proceed to Medical and Rehabilitation Programs at the School by escort of Mental Health Staff;

006.    That Plaintiff's body has undergone changes, as a result of the cross-gender hormone therapy, which includes significant breast growth, feminine facial characteristics, waist, buttocks, thighs, and other internal changes;

007.    That Plaintiff gives a Chronological Statement of Facts and Events, hereinafter:

## CHRONOLOGICAL STATEMENT OF FACTS AND EVENTS

### A.    SEXUAL AND PHYSICAL ASSAULT ■ ICC:

008.    In July 2000, Plaintiff was first transferred to ICC/CCA, after the new facility opened;

009.    In September 2000, Plaintiff was assaulted by an ICC/CCA Security Guard named Jim Shull;

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS ■ Pg. 18

010.    In December 2004, Plaintiff entered into a Settlement Agreement with ICC/CCA defendants: and Jim Shull, (Civil Case No. CV-02-0418-MHW);

011.    In January 2005, Plaintiff was transferred back to ISCI, by the ICC/CCA Warden;

012.    In January 2008, Plaintiff was, once again, transferred back to ICC/CCA for six (6) days, and then transferred back to ISCI, by the ICC/CCA Warden, in conjunction with IDOC Move Coordinator as a result of Plaintiff's complaints;

013.    In March 2008, Plaintiff was placed in Pre-Investigation Segregation, by ISCI Correctional Officer: Webb, for an alleged PREA investigation, for which she, (the alleged victim), informed staff that no sexual activity occurred and was cleared and released back into general population, however, the other Prisoner, (despite her statement that nothing happened), was, non-the-less, found guilty and sent to the Idaho Maximum Security Institution, (hereinafter IMSI);

014.    In April 2008, ISCI once again, for the third time, attempted to transfer Plaintiff back to ICC/CCA, but removed her from the transport list as a result of her complaints to ISCI Correctional Officer: Williams, (hereinafter ISCI defendant: Williams), that Plaintiff believed that she would be sexually and/or physically assaulted at ICC/CCA.  Plaintiff was then lead to believe, by ISCI defendant: Williams, that a notice called *"red flag"* had been entered on the computer, wherein preventing future transfers, of Plaintiff, to ICC/CCA;

015.    On April 20, 2008, Plaintiff sent a **Concern Form** to ISCI defendant: Williams, which stated: "As per out discussion, please make sure that a "Red Flag", is entered into the computer system so that I do not get transferred to ICC again.  I do not want to be sexually or physically assaulted.  ICC as you know is a very violent prison." **(EXHIBIT: CF/001.AI);**

016.    In August 2008, Plaintiff was transferred to North Fork Correctional Facility, (hereinafter NFCF), ("another one of CCA's privately operated prison facility"), which was located in the state of Oklahoma, and never received a reply from ISCI defendant: Williams;

017.    In July 2009, Plaintiff was transferred back to ISCI, from NFCF, at which time Plaintiff was classified, in the presence of ISCI defendant: Williams where, once again, Plaintiff voiced her concerns to ISCI defendant: Williams about being transferred to ICC/CCA, at which point in time, ISCI defendant: Williams assured her that Plaintiff would not be transferred to ICC/CCA and Plaintiff's Classification, was marked with the recommended housing/institution assignment as "ISCI", not ICC/CCA;

018.    On July 2, 2009, Plaintiff sent two (2) **Concern Forms**, prior to being transferred from NFCF, one to IDOC Virtual Prison Warden: "Name Unknown", (hereinafter IDOC defendant: John/Jane Doe # 140), which stated: "Please do not attempt to send me to ICC when I return to Idaho, as ICC is a very violent prison and I do not want to be assaulted."; and, one to IDOC Move Coordinator: Bromly, (hereinafter IDOC defendant: Bromly), which

stated: "Please make sure when I return to Idaho that I am not sent to ICC. Last time I was there an inmate tried to force me to have sex. ICC is very violent. I do not want to be sexually or physically assaulted. Thank you." **(EXHIBITS: CF/002 & 3.A1)**;

019.    In July 2009, Plaintiff was transferred, despite her pleas to IDOC and ISCI Prison Officials, to not send her to ICC/CCA, and never received any reply regarding the two (2) concern forms sent to IDOC;

020.    When Plaintiff arrived at ICC/CCA, Plaintiff spoke with the ICC/CCA Psychiatric Technician: Fletcher, (hereinafter ICC/CCA defendant: Fletcher), about her Gender Identity Disorder and concerns about being physically and sexually abused at ICC/CCA, to which the ICC/CCA defendant: Fletcher, told Plaintiff that Plaintiff was brought to ICC/CCA to participate in the Sex Offender Program ("SOP"), latter changed to Sex Offender Treatment Program, (hereinafter SOTP);

021.    ICC/CCA defendant: Fletcher, advised Plaintiff that Plaintiff would be okay because Plaintiff was going to be housed in the West Wing, where other prisoners similar to her charges were being housed and that all the trouble makers, ("i.e. Security Threat Groups"), (hereinafter STG), where being housed in the North Wing;

022.    Plaintiff was moved to Unit J, M-Pod, in the West Wing, until September 2009, when ICC/CCA placed all "Sex Offenders" into Unit J, Q & R Pods;

023.    In November 2009, ICC/CCA Facilitator: Willias, who was the SOTP Facilitator, ("at that time"), announced that the Plaintiff and another Prisoner, Richard Lee Zacharias # 24596, would be the new Program Seniors on R-Pod, and all Q & R-Pod prisoners where led to believe, by ICC/CCA defendants, that SOTP would be starting soon, and that the Seniors where tasked with getting everyone to adjure to the Program Rules set forth by ICC/CCA defendants;

024.    In December 2009, ICC/CCA Security Guard: Valdez, (hereinafter ICC/CCA defendant: Valdez), and ICC/CCA Security Guard: B. Johnson, (hereinafter ICC/CCA defendant: B. Johnson), entered R-Pod, due to continuing problems with illegal activities with certain prisoners, that were STG member, and announced that R-Pod was no longer a Program pod, and that it was just like "General Population";

025.    Then following day after the announcement, Plaintiff was approached by a group of R-Pod STG members, who mistakenly formed the belief that the Plaintiff had been informing to ICC/CCA defendants, on them, ("STG members"), regarding their illegal activities, simply on the premonition of her status as Program Senior;

026.    Plaintiff was told, by these STG members, that if Plaintiff did not leave the pod that Plaintiff would be assaulted, at which time Plaintiff exited the R-Pod and obtained a "Move Cart", wherein Plaintiff rolled up all her personal property and took it out into the

■ CASE NO.: 1:12-cv-00393-CWD [Document 10] Filed 10/22/12 21 of 216 ■

multipurpose room;

027.   Plaintiff was asked by ICC/CCA Security Guard: Laranze, (hereinafter ICC/CCA defendant: Laranze), what Plaintiff was doing, at which time, Plaintiff informed him that Plaintiff needed to move and if Security refused to move Plaintiff that Plaintiff could be taken to Segregation;

028.   ICC/CCA defendant: Laranze, exited the room and returned, a few minutes later, with ICC/CCA Security Guard: Venem, (hereinafter ICC/CCA defendant: Venem), who then inquired from Plaintiff, as to what was going on, at which time, Plaintiff stated that Plaintiff needed to be moved;

029.   ICC/CCA defendant: Venem, stated that he would not move her, unless Plaintiff advised him what was going on, at which point Plaintiff advised ICC/CCA defendant: Venem, that certain prisoners on R-Pod are accusing her of informing on them;

030.   ICC/CCA defendant: Venem, then screamed "Well, that's just bull sh*t", while storming out of the room and entering R-Pod, where he began to yell at the prisoners on the tier stating "Stover, is not the one that snitched on you!", which only made things worse for her and caused the STG members to actually believe that it was in fact her that informed on them, and had went and told ICC/CCA defendant: Venem, that Plaintiff was currently having problems with them;

031.   Plaintiff was moved to Q-Pod, which is located next to R-Pod, where Plaintiff continued to suffer harassment and bouts of threats, from the STG members on both Q & R Pods;

032.   In January 2010, an ICC/CCA Security Guard: ("Name Unknown"), (hereinafter ICC/CCA defendant: John/Jane Doe # 118), approached Plaintiff and told her that Plaintiff needed to follow him, at which time Plaintiff followed ICC/CCA defendant: John/Jane Doe # 118;

033.   ICC/CCA defendant: John/Jane Doe # 118, lead Plaintiff into a multipurpose room where Plaintiff was confronted by several STG members from R-Pod, at which time they began to integrate her in the presence of the ICC/CCA defendant: John/Jane Doe # 118";

034.   Plaintiff was advised by these STG members that Plaintiff could not return to R-Pod until the program started;

035.   Plaintiff was then advised by ICC/CCA defendant: John/Jane Doe # 118, that Plaintiff needed to step out into the hall, at which time Plaintiff complied, stepping out, but standing close by the door, where Plaintiff could still hear;

036.   Plaintiff heard ICC/CCA defendant: John/Jane Doe # 118, and the STG members talking, and specifically overheard the ICC/CCA defendant: John/Jane Doe # 118, telling the STG members that Plaintiff had in fact informed upon them, which was later confirmed by

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS ■ Pg. 21

several STG members by Plaintiff;

037.   In February 2010, the Plaintiff was, (after allegedly some of the STG members were removed from R-Pod), moved back onto R-Pod, after another prisoner who was allowed to have control over Q-Pod, had her removed from Q-Pod due to her Gender Identity Disorder and feminine characteristics;

038.   On April 4, 2010, at approximately 14:00 hours ICC/CCA defendant: Venem, knocked on R-Pod's tier window and pointed towards Plaintiff, and in a waiving motion which was obviously requesting her to come out of the pod, at which time ICC/CCA defendant: Venem, requested her to go to the multipurpose room;

039.   Plaintiff entered the multipurpose room and was immediately surrounded by several ICC/CCA Security Guards: to wit; B. Johnson, Venem, Weber, Gardner, Kerr, Constantaneau, and Courtright;

040.   Plaintiff states that ICC/CCA defendant: B. Johnson, (hereinafter ICC/CCA defendant: B. Johnson), was the individual that spoke to the her, stating: "[W]e have discussed this issue, and we all agree that your, ("Plaintiff's"), hair looks too feminine.";

041.   Plaintiff was then ordered by ICC/CCA defendant: B. Johnson, to remove her ponytail, which had not been a request to any other Native American at ICC/CCA;

042.   On April 5, 2010, Plaintiff was informed by Prisoner Andy Wolfe, that ICC/CCA defendant: B. Johnson, had informed him, ("Prisoner Wolfe"), about the conversation which took place between ICC/CCA defendants and myself;

043.   In May 2010, offender # "A", who was convicted of Forcible Rape ("Overcome by Force or Violence"), and Infamous Crime Against Nature, was moved onto R-Pod;

044.   STG member # "A", was also a well known STG Member and "Shot Caller," for a STG known as the Surenos;

045.   In June 2010, the prisoners in R-Pod were screened for SOTP, by ICC/CCA SOTP Facilitators: Sevey, Clark, Reading, and Psychologist: M. Johnson, (hereinafter ICC/CCA Facilitator: Sevey, Clark, Reading, and/or ICC/CCA Psychologist: M. Johnson;

046.   On June 16, 2010, the SOTP began it's program curriculum and treatment wherein Affinat participated;

047.   In July 2010, STG member, # "C", moved onto R-Pod;

048.   Plaintiff states that STG member # "C", immediately began to assault other inmate residents both verbally and physically;

049.   Plaintiff witnessed during that first month STG member # "C", punched another inmate resident in the face and told Plaintiff that she was going to perform oral sex on him;

050.   When Plaintiff refused, STG member # "C", went to offender # "A", and had offender # "A" threaten her and forced her to perform oral sex upon STG member # "C" late

that evening;

051. Plaintiff states that STG member # "C", made her perform oral sex upon him while forcing his penis down Plaintiff's throat until he had ejaculated in her throat, while holding her head so that she could not get away;

052. Plaintiff, a few days after the sexual assault was pushed, by offender # "A", down on her bed where he began to threaten her telling her that she had three choices;

053. STG member # "A" told Plaintiff that she could pay him ("# "A""), fifteen dollars rent, every week, perform sex for money for him ("# "A""), or take a beat down and pay him ("# "A"") anyway;

054. Then STG member # "A" further told her that if Plaintiff attempted to tell on them, that he (# "A") would find out because they had guards who would tell them, and there would be no place that she would be safe;

055. Plaintiff at that point fainted ("passing out"), on her bed;

056. Plaintiff later, after recovering from passing out, told offender # "A" that she would pay the fifteen dollars rent per week, but that she would only be able to pay him ("# "A"") once a month;

057. Plaintiff states that STG member # "A" continued to terrorize her on a daily basis, calling her names such as dirt bag, shit face, faggot, f**k face, trampgender, as well as other derogatory names;

058. Plaintiff states that STG member # "A" recruited another offender # "E", to be a soldier for him ("# "A""), and had offender # "E" assault other prisoners, including prisoner Tylor, ("Tayler?"), simply because # "E" did not want to live next to a "Chomo" ("child sex offender");

059. Plaintiff states that after STG member # "E" was released from segregation, he was allowed back into the program by ICC/CCA defendants, while the individual he had assaulted was not allowed back in;

060. In August 2010, another two (2) STG members named # "D" and # "B" were allowed to enter the program and move onto R-Pod, which increased the STG members to four with two (2) other potential members;

061. Plaintiff states that each time that these STG member held meeting, the two (2) "Shot Callers," # "A" and # "B", discuss the selling of narcotics, extortion of vulnerable prisoners, the running of a store, which they forced the Plaintiff to store commissary good out for them, and call hits, which the "Foot Soldiers," # "C", # "D", # "E", and # "F" would carry out;

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS ◼ Pg. 23

062.   Plaintiff states that it was at this time, that offender # "A" informed Plaintiff that she was now # "B's" Bi**h, and belonged to him ("# "B""), and offender # "A" told STG member # "C" that he ("# "C"") would have to find another Bi**h;

063.   On August 14, 2010, Plaintiff was forced to pay rent to STG members "A" and "B", as well as pay rent to STG members # "A" and # "B", for the fifteen, ("$15.00"), dollars a week of extortion money, in the amount of forty five dollars and ninety eight cents, ("$45.98"), Plaintiff's entire commissary order;

064.   On August 16, 2010, offender # "B" came to her bed early in the morning between six and seven o'clock, and pulled Plaintiff's covers off of her, which caused her to wake up;

065.   Plaintiff STG member # "B" then pulled down hard on her underwear practically tearing them off of her;

066.   Plaintiff complained stating: "No! I, ("Plaintiff"), don't want too, leave me alone.";

067.   Plaintiff states that STG member # "B" stated to Plaintiff: "Shut up and do it or... I, ("# "B""), will get *Joker*, ("# "A""), to deal with you, ("Plaintiff").";

068.   Then the STG member # "B" proceeded to climb on top of Plaintiff and then forced her head down into her pillow, while forcing his, ("# "B's""), penis inside of her anus;

069.   Plaintiff states that after offender # "B" had ejaculated, he, ("# "B""), pulled out of her and then climb off of Plaintiff and left the area of her bunk;

070.   Plaintiff states that STG member # "A" continued to maliciously harass her through threats of physical abuse and instant violence, as well as continuing to abuse her verbally calling her derogatory and degrading names;

071.   On September 4, 2010, Plaintiff again had to pay more rent to offender # "A" and # "B", for the fifteen, ("$15.00"), dollars per week of extortion money, in the amount of seventy eight dollars and seventy six cents, ("$78.76), her entire commissary order;

072.   On September 18, 2010, Plaintiff made a third payment to offender # "A" and # "B", for the fifteen, ("$15.00"), dollars a week of extortion money, in the amount of seventy eight dollars and fifteen cents, ("$78.15), Plaintiff's entire commissary order;

073.   On or about October 17, 2010, Plaintiff between six to seven o'clock a.m., offender # "B" came to force Plaintiff out of bed and informed her that she, had to perform oral sex upon his, ("# "B's""), penis;

074.   Plaintiff pleaded with STG member # "B", stating: "No! Please just leave me alone.";

075.   Plaintiff states that the STG member # "B" stated to her: "You, ("Plaintiff"), will do it or else.";

076.   Plaintiff begged offender # "B" stating: "Please, just leave me, ("Plaintiff"), alone.";

077.   Plaintiff states that STG member # "B" simply stated: "I'll just see what *Joker*, ("# "A""), has to say about it when he gets back.";

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS ■ Pg. 24

078.     Plaintiff states that STG member # "B" then pulled his shorts down and grabbed the Plaintiff forcing her, ("Plaintiff") down on her knees in front of offender # "A's" bunk;

079.     Plaintiff states that the STG member # "B" then forced her to perform oral sex upon his penis;

080.     Plaintiff states that as offender # "B" ejaculated into her mouth, he, ("# "B"") forced her head down forcing his penis deeper into her throat;

081.     Plaintiff states that when offender # "B" released her, Plaintiff feeling sick, threw up in the trash can next to offender # "A's" bunk;

082.     On November 7, 2010, at about six or seven o'clock a.m., Plaintiff was awakened by offender # "A", who punched Plaintiff in the side, in her ribs, while stating: "Get up dirt bag. My homie, ("# "B""), wants to f**k you, ("Plaintiff").";

083.     Plaintiff replied: "No, leave me alone.";

084.     Plaintiff states that the STG member # "A" punched her again stating: "Either you, ("Plaintiff"), let my homie, ("# "B""), f**k you or you, ("Plaintiff), take a beat down.";

085.     Plaintiff states that STG member # "B" was standing next to offender # "A", and he, ("# "B""), flipped Plaintiff's blanket off of her and then when Plaintiff attempted to pull the blanket back  over her, offender # "B" slapped her across the face, while jerking the blanked back off of her;

086.     Plaintiff states that the STG member # "A" left the area and offender # "B" forced down Plaintiff's underwear, and proceeded to climb on top of her thereby penetrating her anus with his, ("# "B's""), penis;

087.     Plaintiff states that after offender # "B" ejaculated inside of her anus, and then offender # "B" got off of her and left the area;

088.     Plaintiff states that when offender # "A" returned a short time later he punched Plaintiff again in the side and stated: "Don't take so long next time, when I, ("# "A""), tell you, ("Plaintiff"), to jump, you, ("Plaintiff), jump.";

089.     Plaintiff states that STG member # "A" would continuously terrorize her every day, punching her and acting like he was going to stomp her out, as well as making comments about her wanting to be a girl, stating: "If your going to act like a bi**h, then your going to be treated, by me and my homies, like one.";

090.     Plaintiff spoke to the Program Counselors about problems that were going on relating to these STG members, as well as writing an "anonymous" letter to the ICC/CCA Warden: Wengler, (hereinafter ICC/CCA defendant: Wengler), which Plaintiff sent through the regular outgoing mail, which would have to be processed by ICC's Mail Room Personnel;

091.     Plaintiff states that the letter included each of the STG members names and a generalized statement about these STG members activities;

092.    Plaintiff states that a day later, she observed: ICC/CCA Associate Warden: Perez, (hereinafter ICC/CCA defendant: Perez); ICC/CCA Unit Manager Coordinator: "Name Unknown", (hereinafter ICC/CCA defendant: John/Jane Doe # 117); ICC/CCA defendant: B. Johnson; ICC/CCA STG Investigator: "Name Unknown", (hereinafter ICC/CCA defendant: John/Jane Doe # 116); ICC/CCA Security Guard: Molen, (hereinafter ICC/CCA defendant: Molen); and, ICC/CCA Security Guard: Kerr (hereinafter ICC/CCA defendant: Kerr), who were speaking to the STG members (i.e. STG members A, B & C);

093.    Plaintiff states that however, no action was taken to remove these individuals and in fact these individuals returned to the tier bragging about not getting into trouble and stating that Security was glad and that they, ("STG members # "A" and # "B"), were given permission by Security to run and control the tier;

094.    Plaintiff was informed, by a ICC/CCA Security Guard, after complaining to them about nothing being done about these, ("STG members # "A", # "B", and # "C""), offenders activities and was told that the reason that these three (3) offenders, ("STG members # "A", # "B", and # "C""), keep getting away with their activities is because they were informants giving up information on gang activities, including but not limited to drug activities, assaults, and extortion rackets that were going on in the North Wing by other STG members;

095.    Plaintiff states that the fact that these offenders, ("STG members # "A", # "B", and # "C""), informing was made apparent when Plaintiff witnessed these offenders, ("STG members # "A", # "B", and # "C""), were meeting twice a week with the ICC/CCA defendant: Perez, ICC/CCA defendant: John/Jane Doe # 116, in ICC/CCA defendant: John/Jane Doe # 117, office;

096.    Plaintiff begged ICC/CCA defendant: Kerr, to be moved, because of problems with the STG members, but ICC/CCA defendant: Kerr, ignored her plea;

097.    Plaintiff states that Administration, did at one point, send Maintenance into R-Pod to change the positioning of the Camera, so that it pointed back towards Plaintiff's bunk area;

098.    On November 14, 2011, Plaintiff made a fourth payment to offender # "A" and # "B", for the fifteen, ("$15.00"), dollars a week of extortion money, in the amount of seventeen dollars and sixty seven cents, ("$17.67), which was her entire commissary order;

099.    On November 21, 2011, another prisoner was able to report to the ICC/CCA defendant: Kerr that Plaintiff was having problems with these offenders, ("STG members # "A", # "B" and # "C""), which might lead to her being assaulted;

100.    Plaintiff was called out to the control center, and told to report to ICC/CCA defendant: B. Johnson's, Office;

101.    Plaintiff states that ICC/CCA defendant: Johnson, began to yell at her stating: "You better not be wasting my time.";

102.    Plaintiff broke down crying and explained everything that had been going on from the sexual assaults, to the extortion and assaults;

103.    Plaintiff states that ICC/CCA defendant: B. Johnson, sent Plaintiff to Medical, who then put her in a Medical Cell;

104.    On November 24, 2010, Plaintiff was placed in Administrative Segregation;

105.    Plaintiff states that same day the ICC/CCA defendant: John/Jane Doe # 116, informed Plaintiff that the Security Threat Group had Green Lighted", (i.e. placed a hit), her due to offender's # "A" and # "B" affiliation with them;

106.    On November 25, 2010, Plaintiff sent a **Concern Form** to IDOC Quality Control Coordinator: James, (hereinafter IDOC defendant: James), which stated: "The policy of allowing known violent gang members to be housed w̄ non violent vulnerable prisoners – even in a program environment has lead to the violations of my body through sexual assault and my right to be free from cruel and unusual treatment/punishment.  I was terrorized, ridiculed, assaulted physically, sexually, and mentally.  IDOC trained personnel should have known that such threat exists through common knowledge about gang violence. (Complete deliberate indifference)." **(EXHIBIT: CF/004.A1)**;

107.    On December 17, 2010, Plaintiff sent a sencond **Concern Form**, after not receiving any reply back from IDOC defendant: James, which stated: "IDOC failed to protect vulnerable prisoner's like myself, a transgender individual, from physical & sexual assault, by members of a security threat group, known as "Surenos", when IDOC officials with deliberate indifference placed these known violent gang members into a rehabilitation program for sex offenders, in an open living environment without any staff or security supervision at ICC. Such failure to protect created conditions of confinement that were cruel and unusual punishment." **(EXHIBIT: CF/005.A1)**;

108.    On December 30, 2010, Plaintiff was transferred from ICC/CCA to ISCI, where she was placed in Administrative Segregation in ISCI's Behavior Health Unit (hereinafter BHU);

109.    On December 17, 2010, Plaintiff sent a **Concern Form** to ICC/CCA defendant: Wengler, which stated: "ICC/CCA failed to protect vulnerable prisoners, like myself, a transgender individual, from physical & Sexual assault, by members of a security threat group, known as "surenos", when ICC/CCA officials, with deliberate indifference, placed these known violent gang members into a rehabilitation program for sex offenders, in an open living environment without any staff or security supervison. ICC/CCA further failed to remove such (STG) group even after multiple complaints, such failure to protect created conditions of confinement that were cruel and unusual punishment." **(EXHIBIT: CF/006.A1)**;

110.    On January 25, 2011, sent a second **Concern Form**, after not hearing back from ICC/CCA defendant: Wengler, which stated: "Sir, there were repeated complaints made

concerning gang members in R-Pod (SOTP), who were instilling fear, terror and control over other vulnerable prisoners. The failure of your security staff to take any action or you yourself for that matter, allowed known violent gang members to physically and sexually assault me and terrorize me, and steal from me, as well as others. I personally wrote you an anonymous letter, giving you their names. Still you done nothing. I would like to know why? Why did you and your staff ignore our complaints." **(EXHIBIT: CF/007.A1)**;

111.    On January 27, Plaintiff received a **reply** from ICC/CCA defendant: Wengler, which stated: "I/M Stover, you were assigned to the SOTP program per your pathway. As were other inmates that your describe as violent gang members. Clearly the pathway needs of all inmates in that unit." **(EXHIBIT: CF/007.A1)**;

112.    On January 20, 2011, Plaintiff filed an **IDOC Grievance Form**, (hereinafter Grievance), which stated: "ICC/CCA staff failed to protect vulnerable persons, like myself, From physical and sexual assault by violent gang members, known as Sureno's. When ICC/CCA allowed these known gang members into a program for sex offenders in an open living environment without any staff supervision. ICC/CCA further did fail to remove such security threat group members even after multiple complaints and assaults. Such failure to protect has been customary for ICC/CCA which has created conditions that are cruel and unusual punishment whereby allowing unnecessary violent crimes to occur against vulnerable prisoners in violation of State and Federal laws, and constitutions. This failure caused me to be terrorized by gang members, who physically and sexually assaulted me for three months." **(EXHIBITS: SEC/00000.1 & 2/A1)**;

113.    On February 6, 2011, Plaintiff sent a third **Concern Form**, after still not hearing back from IDOC defendant: James, which stated: "According to my response from ICC for failure to protect me from security threat group members who physically and sexually assaulted me, amongst other criminal acts, IDOC rather than they are responsible for placing known non-violent vulnerable predators (That were security threat group members) into the SOTP program – through IDOC pathway program, with non-violent vulnerable prisoners. Can you please confirm for me whether this is correct and who was responsible for ensuring the safety of vulnerable prisoners, and the pathway screening to assure violent predators are separated from vulnerable ones." **(EXHIBIT: CF/008.A1)**;

114.    On February 16, 2011, Plaintiff received the **Initial Reponse**, to the Grievance, from ICC/CCA Security Guard: Jepsen, (hereinafter ICC/CCA defendant: Jepsen), which stated: "The Idaho Correctional Center immediately responded to the allegations that were brought to staff- once reported. Three Correctional Officers are assigned to the units as floor officers and one for pod control, to include Correctional Counselors, Case Mangers, SOTP staff and a Unit Manager. All these staff are present to enforce policy and procedures, provide security

as well as being available to resolve any and all inmate concerns.  If there is an issue that an offender has it needs to be reported to staff for corrective actions.  All offenders are given a pathway which has been established by the Idaho Department of Corrections.  This process alone will except ALL offenders into programs regardless if they are members of a gang or not."; and, a **Reviewing Authority Response**, from ICC/CCA Associate Warden: Kessler, (hereinafter ICC/CCA defendant: Kessler), which stated: "DENIED. Grievance denied, concur with first response." **(EXHIBITS: SEC/00000.1 & 2/A1)**;

115.    On February 16, 2011, Plaintiff sent a **Concern Form** to ICC/CCA defendant: John/Jane Doe # 116, which stated: "Please explain why you failed in your job of keeping track of STG Members at ICC, and why you allowed them to be housed in a minimum low security wing with vulnerable prisoners?  Please explain why after your became aware of them in August of 2010 – why you decided not to remove them after receiving complaints about them but only talked to them.  Please explain why you put peoples life at risk in the SOTP program by leaving them there." **(EXHIBIT: CF/009.A1)**;

116.    On February 16, 2011, Plaintiff sent a **Concern Form** to ICC/CCA defendant: Kerr, which stated: "I would like to know your reason for refusing to help or move me when I complained to your about security threat group Barajas – whom you knew had a history of violence as a security threat group member.  Whereby, allowing me to suffer.  Certainly you do not deny that other prisoners beside myself did not also complain to you about these individuals.  How many times did your intervene on R-Pod relating to complaints." **(EXHIBIT: CF/010.A1)**;

117.    On February 16, 2011, Plaintiff sent a **Concern Form** to ICC/CCA Security Guard: Molen, (hereinafter ICC/CCA defendant: Molen), which stated: "Can you please explain why you took no action to remove security threat group members form the SOTP program, after you received numerous complaints about them.  As I recall you questioned them at least once a week about those complaints.  You even came on the tier telling them to stop, but never took any action to remove them.  Please explain why?  Your failure to act put us vulnerable prisoners at risk." **(EXHIBIT: CF/011.A1)**;

118.    On February 16, 2011, Plaintiff sent a **Concern Form** to ICC/CCA defendant: B. Johnson, which stated: "After you received that anonymous letter, which I sent to the warden Tim Wengler, regarding inmates A, B, C, D, & E, that where members of a security threat group.  Why did you not take any action to remove them or, conduct an investigation regarding the allegations made therein.  since you've admitted you received the letter, which was sent prior to the last sexual assault, you could have prevented it by placing them under investigation in seg, so as to allow other prisoners the ability to come forward without fear of retaliation.  Please explain." **(EXHIBIT: CF/012.A1)**;

119.   On February 16, 2011, Plaintiff sent a **Concern Form** to ICC/CCA Chief of Security: Jepsen, (hereinafter ICC/CCA defendant: Jepsen, which stated: "Can you please explain why your security staff failed to inform you of the complaints and anonymous letter with security threat group members names on it?  If you where informed, why did you not take any action at that time and why did you not inform the STG Coordinator about potential gang activity. Your failure to promptly act and investigate allowed abusive behavior to continue." **(EXHIBIT: CF/013.A1);**

120.   On February 16, 2011, Plaintiff sent a **Concern Form** to ICC/CCA defendant: John/Jane Doe # 117, which stated: "You stated as a matter of record that you came onto the unit R-Pod to complain about the assaults and extortion that was going on.  Why, did you not take action after Johnson showed you the anonymous note I sent, with the perpetrators names on it.  You had the ability to lock them up, so please explain why they were allowed to remain on the tier and continue their abusive behavior.  Why did you not report it to your supervisors." **(EXHIBIT: CF/014.A1);**

121.   On February 22, 2011, Plaintiff received a **reply** from ICC/CCA defendant: Jepsen, which stated: "This issue has been looked into, ICC acted as quickly as we were notified that an issue was claimed.  Once again ICC responded promptly.  Who did you communicate this issue (problem) to not failed to report it? (if any one)." **(EXHIBIT: CF/013.A1);**

122.   On February 23, 2011, Plaintiff received a **reply** from ICC/CCA defendant: B. Johnson, which stated: "I am not at liberty to discuss any investigation with other offenders with you." **(EXHIBIT: CF/012.A1);**

123.   On February 24, 2011, Plaintiff received a **reply** from ICC/CCA defendant: Molen, which stated: "I am not at liberty to discuss investigations of other offenders with our or any other offender." **(EXHIBIT: CF/011.A1);**

124.   On February 24, 2011, Plaintiff received a **reply** from ICC/CCA defendant: John/Jane Doe # 116, which stated: "If anyone is housed there, they have a need to complete programs.  I had not received any substantial allegations that would warrant removal form a program." **(EXHIBIT: CF/009.A1);**

125.   Plaintiff never received any **reply** from ICC/CCA defendant: John/Jane Doe # 117 **(EXHIBIT: CF/014.A1);**

126.   On February 24, 2011, Plaintiff file an **Appeal** which stated: "While I agree that staff did come on the tier and yell at people and even pull security threat group members out and speak to them.  Security took "no" action to remove them  to fix the problem.  for the most part staff ignored the problem.  Your portrayal of staff present is attempt to lay the blame at IDOC for allowing security threat group members into SOTP program.  Your staff not IDOC was in charge of security.  You knowingly allowed security threat group members to

become a problem by not taking appropriate action to secure them in appropriate housing. In addition your alleged award winning perfect staff often treated the problem s by informing other prisoners that prisoner were writing kites on them and telling these security threat groups members who was telling on them.   You admit that you provided no screening for the SOTP program to insure that violent security threat group members are not entering an area to vulnerable prisoners by your own admission." **(EXHIBIT: SEC/00000.2/AI)**;

127.     On February 24, 2011, Plaintiff filed (9) additional **Grievances**, related to ICC/CCA defendants: Wengler, John/Jane Doe # 116, Kerr, Molen, Johnson, Jepsen, John/Jane Doe # 117, Wengler for Fletcher, and IDOC defendant: James. **(EXHIBITS: GR/00000.1-9/AI)**;

128.     On February 25, 2011, Plaintiff received the **Appellate Authority Response** from ICC/CCA defendant: Wengler, which stated: "DENIED.   Inmates were placed into their needed pathway per their pathway need.   Inmates can not be denied their pathway due to their affiliations, or crimes.   Your claim of sending an unsigned letter is unfounded as no letter was received.   Issues in the SOTP pathway unit were dealt with as they were discovered.   Your claims of violating state (and federal law) are not true, as this is a IDOC."; **(EXHIBIT: SEC/00000.2/AI)**

129.     On March 4, 2011, Plaintiff received a **reply**, relating to her concern form dated 2-16-11, from IDOC defendant: James, which stated: "The IDOC has zero tolerance of STG activity.   STG activity will normally result in disciplinary action in accordance with IDOC Policy and/or criminal prosecution in accordance with the Idaho Gang Enforcement Act.   The strategy for controlling STG activity is behavior-based.   If an offender suspected of affiliating with a specific STG complies with the rules of offender conduct, they are allowed to remain in the general population and granted the privileges afforded to other offenders of the same classification." **(EXHIBIT: REP/001 & 2.AI)**;

130.     On March 7, 2011, Plaintiff sent two (2) **Concern Forms** to IDOC defendant: James, one which stated: "So what your telling me is that IDOC has zero tolerance of STG activity, and therefore, if these STG members were committing criminal acts and ICC staff were aware of their activity but took no action to remove them then error was committed by ICC?   Is this an accurate presumption?   Who decides when at what point does the zero tolerance apply (ICC Staff)?"; and, a second one which stated: "IDOC's classification system, which allowed known violent STG members, into a program w̄ other vulnerable prisoners conflicts w̄ IDOC's zero tolerance.   What did you expect by allowing them in SOTP, & what will you do to prevent other violent STG members from assaulting and raping other vulnerable offenders, who also have a right to program – in a safe inviorment? Please explain." **(EXHIBIT: CF/015a & 15b.AI)**;

131.     On March 12, 2011, Plaintiff sent a **Concern Form** to ICC/CCA defendant: Wengler,

(*for ICC/CCA defendant: Fletcher*), which stated: "Failure of ICC to follow protocol of IDOC Policy # 401.06.03.501, when I entered ICC's RDU (Intake), when I personally informed ICC staff that I was a transgender with Gender Identity Disorder, as well as documented evidence of the same in my medical file, was clearly deliberate indifference to y safety, which directly lead to my being physically and sexually assaulted, and the fact that I informed the staff Charlie Fletcher, of my fears of physical and sexual assault." **(EXHIBIT: CF/016.A1)**;

132. On March 13, 2011, Plaintiff sent a **Concern Form** to IDOC defendant: Bromly, which stated: "I would like to know the name of the official who transferred me to ICC on or about July 2009, and whom authorized such transfer and what criteria was considered in making the decision to transfer me.." **(EXHIBIT: CF/017.A1)**;

133. On March 14, 2011, at 10:15 a.m., Ada County Detectives Bowie and Barttlet from the Ada County Sheriff Department, and ISCI Investigative: Sergeant King, came out to question Plaintiff about the perpetrators that had physically and sexually assaulted her, while Plaintiff was housed at ICC/CCA, as well as matters concerning Plaintiff's sexual history;

134. On March 21, 2011, Plaintiff received a **reply** from IDOC defendant: Bromly, which stated: "All offender returning form NFCF, OK. were sent to ICC. Criteria for placement at any facility is the placement matrix." **(EXHIBIT: CF/017.A1)**;

135. On March 23, 2011, Plaintiff sent a second **Concern Form** to IDOC defendant: Bromly, which stated: "Why was I sent to ICC, despite the fact that I informed ISCI move Sgt. In 2009 – that I would be physically and/or sexually assaulted – if sent there. There was a red flag placed in my C-File in 2007-8 to prevent me from going there. That is why my classification stated ISCI – not ICC – so why was that ignored?" **(EXHIBIT: CF/018.A1)**;

136. On March 25, 2011, Plaintiff received a **reply** from ICC/CCA defendant: Wengler, (*for ICC/CCA defendant: Fletcher*), which stated: "Mr. Fletcher has not been at ICC for several months. As your request is a notice, not a request. I will forward to legal." **(EXHIBIT: CF/016.A1)**;

137. On March 25, 2011, Plaintiff received a **reply** from IDOC defendant: Bromly, which stated: "Had there been cautions in place you would not have been sent. There are no cautions about you being to any facility." **(EXHIBIT: CF/018.A1)**;

138. On April 22, 2011, Plaintiff received notice from ICC/CCA Grievance Coordinator, Chester Penn, which stated: "The nine **(9) grievances** you submitted all deal with the same issue that was addressed in grievance #ICO000092 that your submitted to ICC on 1-20-11. This grievance was denied all the way to appeal on 2-25-11. Your administrative remedies are exhausted on this issue. Ms. Wittington was correct in returning the grievances submitted to her, because you had already grieved the issue at ICC>." **(EXHIBIT: SEC/00000.6/A1)**;

139.    On May 26, 2011, Plaintiff sent a two (2) page **Concern Form** to ISCI defendant: Williams, which stated: "Previously, when you were the Sgt. in unit 7 we had conversations relating to my being transferred to ICC, when you canceled the first time. At that time I had voiced my concern about being physically and sexually assaulted. You told me that there was nothing you could do, unless I gave you the names of those I thought might physically or sexually assault me. When I came back from Oklahoma in July 2009, you participated in my classification process–when we were run through the school after returning. I again voiced my concern about being sent to ICC and fear of being physically and sexually assaulted. You told me that my classification stated ISCI not ICC. What I needed to know or confirm whether your entered my concerns into my "C" file, or advised any of your superiors or the move coordinator about my concerns about being sent to ICC, because I might be physically or sexually assaulted?" **(EXHIBIT: CF/019a & 19b.A1)**;

140.    On June 8, 2011, Plaintiff received a **reply**, from the concern form dated 5/26/11, from ISCI defendant: Williams, which stated: "Stover–I do not recall a specific conversation where you gave me specific information. I do recall when I was the move coordinator that a Move may have been canceled but it wasn't my call. If I remember correctly it would have been per Sgt. Webb. As far as a return from out of state, all safety issued were routed to investigator staff. In either case any information would have gone to investigations staff." **(EXHIBIT: CF/019a & 19b.A1)**;

141.    On June 14, 2011, Plaintiff filed a **Grievance**, which was returned with her attached concern form, by ISCI Grievance Coordinator: Jill Whittington, which stated: "This grievance will not be processed. You are past timeline to grieve." **(EXHIBIT: )**;

142.    On June 16, 2011, Plaintiff sent a **Concern Form** to ISCI Grievance Coordinator: Jill Whittington, which stated: "This grievance is not beyond the time line – because I could not have predicted the sexual assault would occur later II because I did not or was not able to discover until recently that Williams failed to report the concerns to her supervisors and/or make note of such in my C-file so that the move coordinator would privy to the information. Therefore, the time would not become relevant to this issue until I came to the knowledge of why she took no action, which was recently when I was permitted to see my C-file." **(EXHIBIT: CF/020.A1)**;

143.    On June 23, 2011, Plaintiff received a **reply** from defendant: ISCI Grievance Coordinator: Jill Whittington, which stated: "Once again, your are past timeline to grieve this one will not be processed." **(EXHIBIT: CF/020.A1)**;

144.    Plaintiff has resided at ISCI since December 30, 2010, and has attempted to encourage the Idaho Department of Corrections Investigator of Professional Standards to investigate and discipline the ICC/CCA Defendants to no avail;

◼ CASE NO.: 1:12-cv-00393-CWD [Document 10] Filed 10/22/12 34 of 216 ◼

B.     PHYSICAL ASSAULT ◼ ISCI:

145.    On or about February 14, 2012, in the afternoon of Tuesday, while walking through the recreation foyer with another party to go outside, Plaintiff was stopped by offenders ("H") and ("I"), whom began to accuse Plaintiff of being responsible for offender ("I") being moved off of A tier;

146.    Plaintiff stated to offender ("I"), that she had nothing to do with offender ("I")'s current housing situation, that he ("I") alone was responsible for being moved due to his sexual contact with offender ("H");

147.    Plaintiff states that she was immediately called a liar, by offender ("H");

148.    Plaintiff states that she ignored the remarks and proceeded to walk outside with another party;

149.    On or about February 15, 2012, the evening of Wednesday, while Plaintiff was setting at a table in the Mental Health Unit with inmate David Stone, when Curtis Stover, (no relation), walked over and sat down and began to complain about offender ("G") and how he believed that offender ("G") had thrown puke like material on his, ("Curtis Stover"), bed;

150.    Plaintiff states that inmate Curtis Stover seemed very upset about the incident and was later restricted to his cell by staff until he calmed down;

151.    On or about February 16, 2012, around mid day of Thursday, at about 14:30 hours, after getting out of bed, Plaintiff joined inmate David Stone and Mike Halderson at a table in the dayroom of the Behavior Health Unit, (hereinafter BHU);

152.    Plaintiff states that she was informed, by inmate David Stone, that inmate Curtis Stover had made a suggestion to offender ("G") that he needed to pack his things and move off of the tier;

153.    Plaintiff states that at about 14:40 hours, she asked inmate David Stone if he wanted to go for a walk out in the BHU recreation yard;

154.    Plaintiff states that inmate David Stone and she went to the recreation yard, but only stayed a short time due to the cold whether, and returning, at approximately 15:00 hours, to the table at which we were setting earlier;

155.    Plaintiff proceeded to her cell to retrieve beading, (hobby craft), material, while inmate David Stone retrieved his writing material, to which we both sat at the table until the 16:00 hour recall announcement;

156.    Plaintiff states that, during the time while setting at the table at approximately 15:30 hours, was approached by another inmate and informed that someone wanted to talk to me at the recreation door;

157.    Plaintiff states that she went to the door and found that it was offenders ("H") and

("I");

158.   Plaintiff states that offenders ("H") and ("I") were now accusing her of having written a "snitch kite", (concern form), on offender ("G");

159.   Plaintiff states that she informed offenders ("H") and ("I") that she never wrote any thing on offender ("G");

160.   Plaintiff states that at approximately 15:40 hours, she observed offender ("H"), along with other inmates, helping offender ("G") transfer his property from cell 35 to cell 61, a cell that was directly next to Plaintiff's cell;

161.   Plaintiff states that she observed offender ("H") speaking to offender ("G") while pointing his finger in the direction of Plaintiff;

162.   Plaintiff states that, after the recall announcement was made for recall, she proceeded to her cell to put away the beading, (hobby craft), material, so that Plaintiff could then proceed to obtain her prescription, from the 16:00 hour pill-call;

163.   Plaintiff states that, while proceeding to pill-call, noticed that offender ("G") was directly in front of her;

164.   Plaintiff states that she was approximately three to four feet behind offender ("G"), when offender ("G") made a quick about face turn and was immediately in her face yelling at Plaintiff;

165.   Plaintiff states that she observed that there was no ISCI/BHU Correctional Officer on A tier, that Plaintiff seen, at the time that the assault occurred;

166.   Plaintiff states that she attempted to step backward, to avoid conflict, and fell backward apparently knocking herself out;

167.   Plaintiff states that it was at this time that offender ("G") got on top of her and began to punch Plaintiff profusely in the eyes, through the eye glasses, which caused lacerations above both eye brows and under one eye, as well as a mild concussion to the right side of Plaintiff's head;

168.   Plaintiff states that she did not learn the extent of the assault until after Plaintiff regained conciseness and after being taken by Ambulance to Saint Allphonsus Medical Trauma Center;

169.   Plaintiff states that she was seen by Ada County Sheriff's Detective Shellie Strolberg, at which time Plaintiff gave a statement, and then she was transported back to ISCI and placed in the recovery infirmary for one day;

170.   On or about February 17, 2012, Plaintiff was sent back to the BHU, and placed on cell restriction, pending investigation;

171.   Plaintiff states that she only received 4 days worth of Ibuprofin for pain;

172.   Plaintiff states that offender ("G") was also brought back to A tier, and placed in a

cell three doors from Plaintiff;

173.   Plaintiff states that she overheard offender ("G") yelling threw the door to other inmates and bragging how the assault on me was motivated by ("H"), ("I"), and sanctioned by the Security Threat Group;

174.   Plaintiff states that she has suffered permanent injury to her facial area including scars and lumps under the skin, loss of hearing; slight vision impairment, chronic headaches, a mild concussion which causes extreme dizziness and loss of balance of her Equal Librium, which prevents her from performing certain tasks or even getting out of bed in the early morning, as well as property damage;

175.   Plaintiff states that she was informed by certain ISCI/BHU Correctional Officers, that the assault on Plaintiff could have been prevented because of the fact that offender ("G") was on "Cell Restriction Status", at the time of the assault, but the ISCI/BHU Correctional Officers: "Names Unknown", (hereinafter ISCI/BHU defendant: John/Jane Does #'s 157-162), failed to follow through with the "Policy Mandate" which required offender "G" to be secured, in his cell;

176.   On March 8, 2012, Plaintiff sent a **Concern Form** to ISCI Warden: Smith, (hereinafter ISCI defendant: Smith), which stated: "The assault on me on 2/16/12 by offender Faulkner could have been prevented had security staff took proper course to secure offender Faulkner in his cell.  Offender Faulkner had earlier that day been placed on cell restriction status, prior to his assault on me.  The staff, however, failed to secure him.  Thus, allowing him, while in his hostile state to Rome around the tier and assault me.   Furthermore, offender Faulkner was a self admitted STG member of the Neo-Nazi "white Supremacy hate group" who was allowed to Rome around harassing and threatening the elderly mentally ill and other vulnerable prisoners.  Had these issues been properly addressed sooner the assault would not have occurred." **(EXHIBIT: CF/021.A1)**;

177.   On March 19, 2012, Plaintiff received a **reply** from ISCI defendant: Smith, which stated: "Staff appropriately responded to the incident." **(EXHIBIT: CF/021.A1)**;

178.   On March 19, 2012, Plaintiff filed a **Grievance** stating: "The assault on me on 2/16/12 by offender Faulkner could have been prevented had security staff took proper course to secure offender Faulkner in his cell.  Offender Faulkner had earlier that day been placed on cell restriction status, prior to his assault on me.  The staff, however, failed to secure him.  Thus, allowing him, while in his hostile state to roam around the tier and assault me.   Furthermore, offender Faulkner was a self admitted STG member of the hate group known as White Supreme.  He was allowed to run around harassing and threatening the elderly  who are mentally ill and vulnerable. This violated my rights under the 8th amend right." **(EXHIBIT: CON/00000.6/A1)**;

AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS ■ Pg. 36

179.    On March 30, 2012, Plaintiff received an **Initial Response**, to the Grievance, from ISCI Deputy Warden: Coburn, (hereinafter ISCI defendant: Coburn), which stated: "Placement of Offenders in the BHU is approved by Central Office and includes all offenders who meet certain mental health criteria.  We will replace to you 1 thermal top –medium and 1 bra –34a commissary issue."; and, the **Reviewing Authority Response**, from ISCI Chief Psychologist: Craig, (hereinafter ISCI defendant: Craig), which stated: "based on DW Coburn's initial response to your grievance it appears that an agreement has been reached to compensate you for your lost property.   I also agree with DW Coburn's comment related to STG or suspected STG members being placed on the BHU is based on the individuals mental health needs.  Referrals are initiated by the home institution and screened for appropriateness based on mental health criteria." **(EXHIBIT: CON/00000.6–7/A1)**;

180.    On April 9, 2012, Plaintiff filed an **Appeal**, which stated: "The point of this grievance has been ignored, whether or not STG members are intentionally allowed in Unit 16, does not relieve Unit 16 staff, (that worked 2/16/12 @ 16:00 hours), from their responsibility to have secured him in his cell, when he was on cell restriction status and in a volatile state.  Because, they had prior knowledge of his state, but failed to follow though with their responsibility." **(EXHIBIT: CON/00000.7/A1)**;

181.    On March 13, 2012, Plaintiff received the **Appellate Authority Response**, to the Grievance, from ISCI ET & R Director: Evens, (hereinafter ISCI defendant: Evans), which stated: "Determination of placement are based on mental health needs and appropriateness.  The department cannot exclude offenders form services based on pat issues.  The department closely screens all placements and would not place an at risk offender.  It appears your property issues have been remedied.  If you have any specific concerns about safety please work with security staff to include unit sergeant." **(EXHIBIT: CON/00000.7/A1)**;

## C.    SEXUAL HARASSMENT BY SECURITY GUARDS ■ ISCI:

182.    On May 13, 2012, at approximately 13:15 hours, Plaintiff, a Transgender Male–to–female individual, while walking in the ISCI Prison Ballfield, Gym Security staff requested, (by use of the announcement speaker), that Plaintiff report to the "Security Office" in the Gym;

183.    Plaintiff approached the Security Office and was advised by ISCI Correctional Officer:  Allen, (hereinafter ISCI defendant: Allen), to come in and shut the door;

184.    Plaintiff complied with ISCI defendant: Allen and entered the office but leaving the door open;

185.    Plaintiff observed approximately four to five other male Correctional Officers:

"Names Unknown", (hereinafter ISCI defendant: John/Jane Does #'s 163-167), in the office, besides ISCI defendant: Allen;

186.     Plaintiff further observed that one the other four to five ISCI defendant: John/Jane Does #'s 163-167, turned and shut the door, and then joined the other defendants in a circular line around Plaintiff;

187.     Plaintiff was then informed by ISCI defendant: Allen, who did all the speaking, that they wanted to know if Plaintiff was stuffing her Bra to which Plaintiff replied that she was not;

188.     Plaintiff was then ordered by ISCI defendant: Allen, to lift her shirt and show them (All five to six Male ISCI Correctional Officers);

189.     Plaintiff informed the ISCI defendant: Allen and other four to five ISCI defendant: John/Jane Does #'s 163-167, that were present, that such conduct would not be appropriate;

190.     Plaintiff was again ordered by ISCI defendant: Allen, to expose her Breasts and underside of her Bra;

191.     Plaintiff was informed by ISCI defendant: Allen, that ISCI/BHU Correctional Officers, had given them permission to look at Plaintiff's Breasts;

192.     Plaintiff reluctantly, with feelings of humiliation and degradation, complied with ISCI defendant: Allen's verbal orders, to exposed her Breasts and the underside of her bra to ISCI defendant: Allen and other ISCI defendants: John/Jane Does #'s 163-167;

193.     Plaintiff states that she was shocked and left the Security Office as fast as she could and informed a few of the other prisoner's, that she had been walking with, what had happened in the Security Office;

194.     Plaintiff was eventually approached and informed by other prisoners, that they heard (prior to her being called to the Security Office), these same ISCI Correctional Officers, walking around the Gym and placing bets as to whether or not her Bra was stuffed or not;

195.     Plaintiff has reasonable belief that the actions of these Correctional Officers were inappropriate and at a minimum constituted sexual harassment in violation of IDOC Policy 201, Respectful Workplace, as well as Plaintiff's rights under the United States and State of Idaho Constitutions, and/or a boarderline crime of Sexual Assault;

196.     Plaintiff states that under the Gender Identity Disorder: Healthcare for Prisoners with, (IDOC Policy 401.06.03.501), which states on page 8 of 9-9, under # 11.  Moral and Ethical Treatment of Offenders Diagnosed with GID, Offenders diagnosed with GID: ¶ 2 ●  Will not be harassed because of their condition; and, ¶ 3 ●  Will be treated by staff in a manner consistent with policy 201, *Respectful Workplace*. (i.e., Staff members must maintain a respectful and professional demeanor, and refrain from harassing Offenders due to their gender/sex, ect.);

197.     Plaintiff states that there were other means less intrusive, such as requesting a female Correctional Officer or Female Medical Staff to inspect her, as previously done;

198.     Plaintiff states that while it was proven that Plaintiff was in fact not stuffing her Bra, no security threat was involved to justify her being Sexually Harassed by these male defendants;

199.     Plaintiff further asserts that the action of these male defendants may have violated the Federal Prison Rape Elimination Act (PREA), as well as constitutional law, which could be construed as a "Sexual Assault," in violation of both state and federal law;

200.     Plaintiff believes that these male defendants actions warranted the immediate suspension and/or dismissal from IDOC employment ;

201.     Plaintiff states that, after returning to BHU, she reported the incident to the ISCI/BHU Corporal: Taylor, who completed an Incident Report and sent it to ISCI Shift Lieutenant: Berd;

202.     Plaintiff was later called out to the Security Office by ISCI Shift Lieutenant: Berd, and questioned about the incident at the Gym with the ISCI defendants: Allen and John/Jane Does #'s 163-167;

203.     Plaintiff informed ISCI Shift Lieutenant: Berd, of the incident and of what Plaintiff heard  stated by other prisoner's;

204.     Plaintiff was then informed by ISCI Shift Lieutenant: Berd, that the matter would be investigated and that he, ("ISCI Shift Lieutenant: Berd"), would not tolerate it, if it were found to be true;

205.     Plaintiff spoke to ISCI/BHU Correctional Officer: Nuttall, regarding the Gym incident;

206.     Plaintiff was informed by ISCI/BHU Correctional Officer: Nuttall, that he was called by the ISCI defendant: Allen, from the Gym and asked if Plaintiff was allowed to have a Bra and be out on the yard (general population), to which ISCI/BHU Correctional Officer: Nuttall replied that Plaintiff was allowed on both issues;

207.     Plaintiff then asked ISCI/BHU Correctional Officer: Nuttall if he or any other ISCI/BHU Correctional Officers gave the ISCI defendants: Allen, and John/Jane Does #'s 163-167, at the Gym, permission to require Plaintiff to expose her Breasts, to which ISCI/BHU Correctional Officer: Nuttall replied: "No", no staff in BHU ever give any Correctional Officer in the Gym permission to order Plaintiff to expose her Breast to them and this was also confirmed by ISCI/BHU Sergeant: Greenland on May 14, 2012;

208.     Plaintiff states that, the statement ISCI/BHU Correctional Officer: Nuttall, gave Plaintiff, is contrary to what the ISCI defendant: Allen, at the Gym, had stated to Plaintiff for which to convince her to expose her Breast;

209.    Plaintiff attemped to call the PREA Hotline to report the Sexual Harassment and/or Sexual Assault, but was prevented from doing so by ISCI/BHU Correctional Officers: "Names Unknown", (hereinafter ISCI/BHU defendants: John/Jane Does #'s 174-179), refusal to provide Plaintiff with the Proper Reporting Number;

210.    Plaintiff dialed 1-0-028201-9042- *955; *9955; *9555; and 95*, which are the numbers in which other individuals provided to Plaintiff that were suppose to be the correct number;

211.    Plaintiff was not provided the number and/or the number had been blocked by ISCI Prison Administrators: "Names Unknown", (hereinafter ISCI defendants: John/Jane Does #'s 151-156), to prevent Plaintiff from accessing the number through her "pen-number";

212.    Plaintiff states that, no where in BHU, where Prisoners have access to phones, was the PREA number, accessible at any time of the alleged incident, relating to this complaint, and Plaintiff was not provided or given any information relating to the reporting method of a possible PREA incident;

213.    Plaintiff made a request to the second shift staff at about, 20:45 hours, to speak to the ISCI Shift Lieutenant: Berd but was not allowed to;

214.    Plaintiff, at about, 22:46 hours, was released for her shower and she made the same request to another ISCI/BHU Correctional Officer: Denen, to be able to speak to the ISCI Shift Lieutenant: Berd;

215.    At approximately 22:57, after an ISCI Correctional Officer came by Plaintiff's door, and she asked for some Concern Forms, at which time, the Correctional Officer replied that the Shift Lieutenant was busy and had more important matters to deal with than her issues;

216.    Plaintiff's door was opened at approximately 00:40 hours and she was let out to speak with ISCI Shift Lieutenant: Soto, (hereinafter ISCI defendant: Soto), about the issue of not being able to contact a PREA Representative and observed that ISCI defendant: Soto, was with another intimidating looking Correctional Officer;

217.    Plaintiff felt, that the other Correctional Officer, that was with ISCI defendant: Soto, was there to intimidate her;

218.    Plaintiff began, by asserting that she had been attempting to contract a PREA Representative and was not able to due so, due to the number not being posted and/or the number being blocked, to which ISCI defendant: Soto, stated: "What makes you think it is a PREA matter";

219.    Plaintiff explained what had taken place and what was stated to her by both other Correctional Officers and Prisoners alike, to which ISCI defendant: Soto, replied: "What is it that your trying to achieve by doing this";

220.    Plaintiff replied that these individuals should be terminated because these