UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JESSIKA ELLEN STOVER, aka JESSIE E. STOVER, | Case No. 1:12-cv-00393-EJL |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| CORRECTIONS CORPORATION OF AMERICA; IDAHO CORRECTIONAL CENTER; MICHAEL KERR; TIMOTHY WENGLER; CORIZON, LLC, f/k/a CORIZON, INC.; RYAN ALLEN; SHANNON MAGON; SHELL WAMBLE-FISHER; JEFF KIRKMAN; WALTER ROMREILL; RONA SEIGERT; and JOSEPH CARDONA, | |
| Defendants. | |

Plaintiff, a prisoner in the custody of the Idaho Department of Correction

("IDOC"), is proceeding pro se in this civil rights action. At all times relevant to

Plaintiff's claims, Plaintiff was incarcerated either at the Idaho Correctional Center (from

July 21, 2009, to December 29, 2010), or the Idaho State Correctional Institution (from December 30, 2010, to the present).

Now pending before the Court are three motions for summary judgment filed by (1) Defendants Idaho Correctional Center, Corrections Corporation of America, Michael Kerr, Timothy Wengler, and Joseph Cardona (collectively, the "CCA Defendants") (Dkt. 123); (2) Defendant Corizon, LLC ("Corizon") (Dkt. 124); and (3) Defendants Ryan Allen, Shannon Magon, Shell Wamble-Fisher, Jeff Kirkman, Walter Romreill, Rona Siegert, and Joseph Cardona[1] (collectively, the "IDOC Defendants") (Dkt. 126). Also pending is the IDOC Defendants' Motion to Strike. (Dkt. 143.)

Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1. Accordingly, the Court enters the following Order (1) granting in part and denying in part the CCA Defendants' Motion for Summary Judgment, (2) granting in full Corizon's Motion for Summary Judgment, and (3) granting in part and denying in part the IDOC Defendants' Motion for Summary Judgment.

All claims against Defendants Corizon, Allen, Magon, Romreill, Siegert, and Cardona will be dismissed with prejudice. As set forth below, upon entry of this Memorandum Decision and Order, the only claims remaining in this action will be (1)

---

[1]     Defendant Cardona was employed by CCA as a Health Services Administrator at ICC until July 31, 2010, and is now employed by the IDOC. (Cardona Aff., Dkt. 123-6, ¶ 2.) Counsel for the CCA Defendants and counsel for the IDOC Defendants both state that they represent Defendant Cardona. (Dkt. 123 & 126.) All claims against Defendant Cardona involve Plaintiff's medical treatment while incarcerated at ICC or ISCI.

Plaintiff's Eighth Amendment failure-to-protect claims against Defendants ICC, CCA, Kerr, and Wengler; and (2) Plaintiff's RLUIPA claims for injunctive relief, with respect to Plaintiff's desire to participate in a religious sweating ceremony, against Defendants Kirkman and Wamble-Fisher.

## INTRODUCTION

Plaintiff is a Native American male-to-female transgender prisoner. She has been diagnosed with Gender Identity Disorder ("GID").[2] Although Plaintiff receives female hormone therapy and has developed feminine characteristics such as breasts, she is incarcerated in a men's prison because she remains anatomically male—she has not had sex reassignment surgery. Plaintiff is incarcerated at Idaho State Correctional Institution ("ISCI"), though some of her current claims arose while she was incarcerated at a prison then-known as Idaho Correctional Center ("ICC"), which was formerly operated by CCA, a private prison company, under contract with the IDOC.[3]

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute, as well as the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*. She sues various individual prison officials as well as CCA and ICC. She

---

[2]      The Court refers to Plaintiff with feminine pronouns because she self-identifies as a female.

[3]      Idaho Correctional Center is now known as Idaho State Correctional Center and is operated by the IDOC.

also sues Corizon, the private entity providing medical care to Idaho inmates under contract with the IDOC.[4]

In its Initial Review Order, the Court reviewed Plaintiff's Amended Complaint pursuant to 28 U.S.C. §§ 1915 and 1915A and allowed Plaintiff to proceed on the following four groups of claims against the following Defendants:

    (1)    Eighth Amendment failure-to-protect claims against Defendants ICC, CCA, Kerr, and Wengler with respect to Plaintiff being sexually assaulted by other inmates in the summer and fall of 2010;

    (2)    Eighth Amendment sexual abuse and sexual harassment claims against Defendants Allen and Magon with respect to an incident where Defendant Allen ordered Plaintiff to show him and Magon her breasts;

    (3)    Eighth Amendment medical treatment claims against Defendants Corizon, Cardona, and Siegert with respect to Plaintiff's alleged need for specific, medically necessary bras and underwear; and

    (4)    First Amendment and RLUIPA claims against Defendants Romreill, Kirkman, and Wamble-Fisher with respect to Plaintiff's desire to perform a smudging ritual and to use the sweat lodge at ISCI.

(Initial Review Order, Dkt. 16.)

---

[4]    At the time of the events giving rise to Plaintiff's claims, Corizon did not provide medical treatment to inmates at ICC. Rather, CCA was responsible for providing medical care to inmates at that prison. Therefore, while Plaintiff was incarcerated at ICC, her medical treatment was provided by CCA; while she was incarcerated at ISCI, it was provided by Corizon.

**MEMORANDUM DECISION AND ORDER - 4**

## THE IDOC DEFENDANTS' MOTION TO STRIKE

The IDOC Defendants move to strike some of Plaintiff's evidentiary submissions as inadmissible. In the summary judgment context, a motion to strike is unnecessary, but not necessarily improper. Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Advisory Cmte. Notes, 2010 Amendments to Rule 56 ("The [Rule 56(c)(2)] objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike*." (emphasis added)).

The IDOC Defendants ask the Court to strike, *inter alia*, the affidavits of all witnesses whom Plaintiff did not identify in her initial disclosures, her supplemental disclosures, or her responses to Defendants' discovery requests. Rule 37(c) prohibits a party from using undisclosed information "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Plaintiff has submitted affidavits from the following individuals: Adree Edmo, Erinn Wright, Amber Renee Brune, David Paul-Whitestorm Hochstetler, Kyle Merrill, David Thieme, and Jeremy Meyer. Plaintiff does not dispute that she did not initially disclose the identities of these individuals, nor did she supplement her disclosures to identify them. Plaintiff has not attempted to justify her failure to disclose this information, or to establish that the failure to disclose was harmless. Therefore, the Court

will grant in part the IDOC Defendants' Motion and will strike the affidavits of these individuals. The Motion will be denied in all other respects.

## THE CCA DEFENDANTS' OBJECTION
## TO PLAINTIFF'S OPPOSITION MATERIALS

In its Reply in Support of its Motion for Summary Judgment, the CCA Defendants ask the Court to disregard Plaintiff's opposition materials in their entirety. *See* Fed. R. Civ. P. 56(c)(2). The Court shall address each of the CCA Defendants' arguments in turn.

First, the CCA Defendants imply that Plaintiff's opposition brief does not comply with the Court's page limitations. (Dkt. 145 at 3.) Memoranda in support of or in opposition to a motion for summary judgment may, in general, be no longer than 20 pages. (Dkt. 125; D. Idaho Loc. Civ. R. 7.1.) However, the Court allowed Plaintiff to file a consolidated response to the three pending motions for summary judgment and stated that any such consolidated response must be no longer than *60 pages*. (Dkt. 133 at 2.) Plaintiff's 59-page brief obviously complies with that limitation. The CCA Defendants' argument on this issue is meritless.

Second, the CCA Defendants state that the font of Plaintiff's opposition brief is too small. Although the CCA Defendants are correct in this regard—the font in Plaintiff's brief is clearly smaller than the minimum 12-point font (*see* Loc. Civ. R. 5.2)—the Court will excuse Plaintiff's non-compliance on this one occasion and has considered her opposition brief.

Third, the CCA Defendants correctly point out that the "bankers box full of unorganized, unlabeled, often double-sided, miscellaneous documents," which Plaintiff

submitted in opposition to Defendants' motions, does not consistently "direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Instead, Plaintiff simply submitted hundreds of pages of documents without making an attempt to assemble them in an organized way, other than numbering various exhibits. Because Plaintiff is a pro se litigant, the Court will not disregard her materials in their entirety, but has considered these materials to the extent that Plaintiff has clearly identified them in her opposition brief. *See* Fed. R. Civ. P. 56(c)(3) (stating that when deciding a motion for summary judgment, the Court "need consider only the cited materials").

Finally, the CCA Defendants argue that many of the documents submitted by Plaintiff have not been properly authenticated. However, the materials considered by the court at summary judgment need only be *capable of being presented* in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Therefore, the Court assumes that Plaintiff could lay the proper foundation for her evidence and could authenticate any of her submitted documents at trial. Defendants may, of course, challenge the admissibility of any of Plaintiff's evidence at trial. *See* Advisory Cmte. Notes, 2010 Amendments to Fed. R. Civ. P. 56.

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This Memorandum Decision and Order includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not

contradicted by clear documentary evidence in the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

## 1. Summary Judgment Standard of Law

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, as noted previously, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co.*, 336 F.3d at 889.

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in the light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## 2.     Standard of Law for Section 1983 Claims

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute. To succeed on a claim under § 1983, a plaintiff must establish a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Prison officials are generally not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677

(2009) ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

An individual defendant "may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). This causal connection "can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (internal quotation marks, citation, and alterations omitted).

To prevail on her § 1983 claims against ICC, CCA, and Corizon as entities, Plaintiff must meet the test articulated in *Monell v. Department of Social Services*, 436 U.S. 658, 690-94 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell*, the requisite elements of a § 1983 claim against a municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Further, a municipality or private entity performing a state function "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010).

3.      **Plaintiff's Eighth Amendment Claims**

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, Plaintiff must show that she is (or was) "incarcerated under conditions posing a substantial risk of serious harm," or that she has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard— deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

"[D]eliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. To exhibit deliberate indifference, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). However, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm).

A. ***Defendants ICC, CCA, Kerr, and Wengler Are Not Entitled to Summary Judgment on Plaintiff's Failure-to-Protect Claims***

i. <u>Factual Background</u>

Plaintiff claims that Defendants failed to protect her against attacks from other inmates. At all times relevant to the claims at issue here, Plaintiff was a participant in ICC's Sexual Offender Treatment Program ("SOTP"). The SOTP was "designed to

provide appropriate cognitive behavioral treatment" for sex offenders. (Decl. of John Sevy, Dkt. 123-8, at ¶ 5.)

All of the SOTP participants, including Plaintiff and the inmates who attacked her, were housed together on the same tier: R-Pod, in the West Wing of ICC. (*Id*. at ¶ 12.) R-Pod was "an open dormitory with 59 beds, similar to general population" except that there were more property restrictions in R-Pod. (*Id*. at ¶¶ 12-13.) This housing arrangement "allowed the inmates privacy and confidentiality while working on their Individual Treatment Plans and to discuss treatment concepts openly with other tier inmates." (*Id*. at ¶ 12.) In order for an inmate to participate in the SOTP, they must be housed in R-Pod.

Plaintiff was sexually assaulted by other inmates—each of whom was designated as a member of the Security Threat Group ("STG") at ICC—on four occasions in the summer and fall of 2010. (Pl. Consol. Memo. at 32; CCA Memo. in Support, Dkt. 123-1, at 13.) At some point between August and November of that year, Plaintiff wrote an "anonymous letter" to then-Warden Wengler. This letter "detailed the specific names and activities of STG members," but Plaintiff concedes that she "made [the letter] sound like someone else wrote it" because she was afraid that the gang members might find out about the letter. (Pl. Consol. Memo. at 32.) The letter is not part of the record in this case, but Plaintiff described it in her deposition as follows:

Q.    What was the content of this letter, if you recall?

A.    The content of the letter gave some information about [STG] gang activities, about the assaults that were going on and stuff, and about extortion.

. . .

Q.    Did you identify anyone by name?

A.    I identified all of the perpetrators, the gang members, by as much information as I could give, their names. . .

. . .

Q.    So your name is not on [the letter]; correct?

A.    Correct.

Q.    And you explained, generally, to the warden, Warden Wengler, that there were things going on, on the tier; correct?

A.    Yes. I explained there were all kinds of stuff going on there.

Q.    You talked about extortion in the letter?

A.    Extortion. Assaults, they were assaulting other inmates. There was another inmate. . . who was assaulted, sexually assaulted by [a gang member], the week after I was or around the same time.

. . .

Q.    Did you include that in your letter?

A.    In what letter?

Q.    Your letter to Wengler?

A.    About [that other inmate]?

Q.    About that other assault? Or was this more of a general letter.

>A.   No. I did a general letter. Because some of the staff over there would often take the kites—I witnessed this myself—and go tell these gang members that inmates were writing kites on them. So I made it . . . general to make it sound like it came from someone other than myself.
>
>Q.   So you wouldn't have said, "[Inmate X] assaulted me on this date"?
>
>A.   No, I did not. I made it generalized that they were—I gave them enough information to where they could do something to get rid of these guys.

(Stover Depo. [Ex. A to Tyler Williams Decl., Dkt. 123-4] at 56-61.)

Shortly after Plaintiff wrote the letter to Wengler (and as early as the next day), staff members took aside the inmates identified in the letter and questioned them. (*Id*. at 57, 61.) Plaintiff states that when the inmates came back to the tier, they said, "Yeah, they bought everything we said pretty much, and said we can—they're letting us run this tier." (*Id*. at 58.)

At some point during this period of summer and fall, Plaintiff met with Defendant correctional officer Michael Kerr on two occasions. During one of these meetings, in early August, Plaintiff asked Kerr to move her bunk "towards up front where the camera could see [her]." (*Id*. at 64.) Plaintiff told Kerr that she "didn't feel comfortable" around the other inmates. (*Id*. at 67.) Plaintiff did not provide any specific details to Kerr because she thought it was "obvious. Why would someone ask to be moved next to a camera? I didn't want to—these guys made shanks." (*Id*. at 72.) Although Plaintiff's bunk was not moved, at some point prison workers did move the security camera so that it pointed

toward Plaintiff's area. (*Id*. at 68.) Although the precise timing of the camera change is unclear, Plaintiff testified, "I think what they were trying to do is keep an eye on these guys." (*Id*. at 70.)

When Plaintiff spoke with Defendant Kerr the second time, she again asked to be moved to a different area because "these people were assaulting people." (*Id*. at 74.)

> Q.    And what did you specifically say to [Kerr]? Did you name—did you identify [your attacker] by name, or did you just say, "individuals"?
>
> A.    I said—I can't remember if I said "individuals" or named them. But I think I said, those—"that group back there."
>
> Q.    And kind of pointing towards the area where—
>
> A.    The group where I met the gang members. And I referred to them as gang members, that little clique.
>
> . . .
>
> Q.    Did you say anything about sexual assaults, or was it—
>
> A.    I didn't say anything about sexual assaults at that point. I was too scared to. I was still being mostly generalized, because I didn't want them going in there and saying, "Blah, blah, blah," and the next thing I know I'm getting stabbed.
>
> Q.    You don't remember specifically if you identified them by name, but you at least generally said, "those people back where I live"?
>
> A.    Yes.

(*Id*. at 76-77.) Kerr questioned Plaintiff about specifics, trying "to get more information out" of Plaintiff, but Plaintiff did not elaborate. (*Id*. at 78.)

Plaintiff acknowledges that she did not report being sexually assaulted until November 21, 2010. On that date, Inmate Rubin Parks informed prison staff that Plaintiff was in danger, saying, "You need to get Stover out of there. They're going to get Stover." (*Id*. at 82.) Plaintiff was then called to Unit Manager Brian Johnson's office, where she "broke down" and "started spilling everything." (*Id*. at 80.) At that point, prison staff took Plaintiff to the medical unit, asked her to write incident reports about the assaults, and placed her in protective custody. (*Id*. at 84.)

   ii. <u>Standard of Law and Discussion</u>

Prison officials who act with deliberate indifference "to the threat of serious harm or injury" by one prisoner against another are subject to liability under § 1983. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal quotation marks, citation, and alterations omitted). Because there is no doubt that Plaintiff did face a substantial risk of serious harm by other inmates—she was assaulted four separate times—the question becomes whether Defendants ICC, CCA, Wengler, and Kerr were actually aware of that risk yet deliberately disregarded it. Although even an obvious danger does not result in liability if

the official is not subjectively aware of it, a prison official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843.

a.    *Failure-to-Protect Claims Against ICC and CCA*

As noted previously, to be entitled to summary judgment on Plaintiff's failure-to-protect claims against ICC and CCA, those Defendants must show that there is no genuine dispute as to whether CCA had a deliberately indifferent custom or policy that was the moving force behind a violation of Plaintiff's constitutional rights. *Mabe*, 237 F.3d at 1110-11; *Monell*, 436 U.S. at 690-94. For ICC or CCA to be liable under § 1983, it "must have (1) had a policy that posed a substantial risk of serious harm to [Plaintiff]; and (2) known that its policy posed this risk." *Gibson*, 290 F.3d at 1188.

Defendants ICC and CCA have not carried their initial burden of showing a lack of a genuine dispute of material fact as to Plaintiff's failure-to-protect claims. CCA undisputedly had a custom or policy of requiring all sex offenders participating in the SOTP to be housed together in the same unit—a unit with a particular physical layout. (Decl. of John Sevy, Dkt. 123-8, at ¶¶ 12-13.) Therefore, the question becomes whether a jury could conclude that this housing policy amounted to deliberate indifference and was the moving force behind Plaintiff's injuries.

The area in which Plaintiff was housed at the times relevant to her claims—a tier made up entirely of sex offenders—was an open dorm with 59 beds, without individual

cells. Plaintiff is a transgender prisoner with feminine characteristics. These undisputed facts lead the Court to conclude that a genuine dispute exists as to whether CCA's policy of housing a male-to-female transgender prisoner with as many as 58 other male sex offenders in an open dorm setting creates such an obvious risk of sexual assault that the policy amounts to deliberate indifference to the safety of the transgender prisoner. *See Farmer*, 511 U.S. at 842; *Monell*, 436 U.S. at 690-94. A jury could also conclude that the housing policy was the moving force behind the violation of Plaintiff's constitutional rights.

b.      *Failure-to-Protect Claims Against Wengler and Kerr*

Defendants Wengler and Kerr have submitted evidence that until November 21, 2010, Plaintiff reported only generalized information about assaults by gang members and their activities. Plaintiff purposefully composed her letter to Wengler to make it appear that someone else wrote it, thereby remaining silent as to her own experiences and fears about the inmates on the tier. Similarly, Plaintiff concedes that she did not inform Kerr of any specific fears or threats during either of their two meetings. Further, after Plaintiff wrote the anonymous letter to Wengler, prison staff questioned the inmates whom she had identified in the letter as extorting or assaulting other inmates, and at one point the camera was moved toward Plaintiff's area so that, in Plaintiff's words, prison officials could "keep an eye on these guys." (Stover Depo. at 70.) Finally, when Plaintiff did report the attacks against her, she was immediately taken to the medical unit and then housed in protective custody. These facts might tend to show that Defendants Wengler

and Kerr—"rather than being deliberately indifferent—[were] unquestionably trying to help" ensure Plaintiff's safety. *Patterson v. Hudson Area Schools*, 551 F.3d 438, 454 (6th Cir. 2009).

However, the evidence also establishes that Wengler and Kerr, though perhaps not aware of a specific and immediate threat to Plaintiff's safety, were evidently aware that Plaintiff is a transgender prisoner and that she was housed in an open dorm with up to 58 other male sex offenders—individuals who, as evidenced by their history of sex offenses, might very well seek to exploit or assault Plaintiff, who has feminine characteristics as a result of her hormone therapy. Given these facts, a jury could reasonably conclude that Defendants Wengler and Kerr subjectively drew the inference that Plaintiff faced a substantial risk of serious harm at the hands of the other sex offenders, yet deliberately disregarded that risk. As the Supreme Court made clear in *Farmer*, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." 511 U.S. at 843.

For the foregoing reasons, the CCA Defendants' Motion will be denied as to Plaintiff's failure-to-protect claims against ICC, CCA, Wengler, and Kerr.

**B.     *Defendants Allen and Magon Are Entitled to Summary Judgment on Plaintiff's Sexual Abuse and Harassment Claims***

Plaintiff claims that she was subjected to sexual abuse and sexual harassment by Defendants Allen and Magon.

i.    <u>Factual Background</u>

According to Plaintiff, on May 13, 2012, she was in the recreation yard and noticed Defendant Allen and another correctional officer staring at her. (Plaintiff's Consol. Memo., Dkt. 141-1, at 9.) As she was walking with another prisoner, Kevin Young, near the ball field, she "was summoned by the Tower Guard at Tower #7, to report to the gym Security Office." (*Id.*; Kevin Young Decl. at ¶ 10.)

When Plaintiff arrived at the security office, Defendant Allen and five other guards, including Defendant Magon, were staring at her. Allen asked Plaintiff if she stuffed her bra, and Plaintiff responded that she did not. (Pl.'s Consol. Memo. at 10; Stover Depo. at 176.) Defendant Allen then allegedly told Plaintiff—falsely—that he had permission to conduct a strip search. Plaintiff protested, stating that she needed a female officer or medical staff to conduct the search. (Stover Depo. at 176.)

Allen then gave Stover a direct order to show the officers her bra and breasts. (*Id.* at 177.) Plaintiff reluctantly complied, displaying "her breasts and underside of bra to all male correctional officers in the room." (Consol. Memo. At 10.) Plaintiff later learned from correctional officers Lieutenant Baird and Sergeant Greenland that Allen had not asked permission to conduct this search and that the search was inappropriate. (Stover Depo. At 177-78.) Plaintiff also learned from other inmates that, prior to the search in the security office, correctional officers were "making jokes and placing bets with one another as to whether [Plaintiff's] breasts were real or stuffed." (*Id.* at 178; *see also* Aff.

of Irwin Adams at ¶ 3; Aff. of Johnny Manning at ¶ 3; Aff. of Christopher Morgan at ¶ 3; Aff. of James Hebert at ¶¶ 2-3.)

According to Plaintiff, her breast area is usually searched by female correctional officers pursuant to an IDOC policy. (Pl.'s Consol. Memo. At 12-14.)

ii.     Standard of Law and Discussion

Plaintiff claims that Defendants Allen and Magon violated the Eighth Amendment and IDOC policy by conducting the May 13, 2012 search of Plaintiff's breast area, joking about Plaintiff, and falsely stating that they had permission to view Plaintiff's breasts.

Prisoners have an Eighth Amendment right to be free from sexual abuse. *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000). Sexual abuse by a prison guard is "inconsistent with contemporary standards of decency and repugnant to the conscience of mankind." *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (internal quotation marks omitted). Although threats and verbal abuse are generally insufficient to state a civil rights violation, sexual harassment can constitute "calculated harassment unrelated to prison needs," which violates the Eighth Amendment. *Hudson v. Palmer*, 468 U.S. 517, 530 (1984).

However, an isolated incident of sexual abuse or harassment does not rise to the level of a constitutional violation unless it is severe. *See Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012) (no Eighth Amendment violation where officer "approached [an inmate] while [the inmate] was still on the toilet, rubbed his thigh against [the inmate's] thigh, began smiling in a sexual [context], and left the cell laughing."); *Somers*

*v. Thurman*, 109 F.3d 614, 616, 623-24 (9th Cir. 1997) (no Eighth Amendment violation where female officers conducted visual body cavity searches of male inmates and watched the inmates shower, all while pointing at the inmates, gawking, and joking among themselves).

If Plaintiff's allegations are true, Defendants Allen and Magon joked and placed bets about whether Plaintiff stuffed her bra and required Plaintiff to show them her breasts in a non-intrusive way, on one occasion, without a legitimate security reason. This alleged conduct—though "despicable and . . . potentially . . . the basis of state tort [liability],"—does not constitute "a harm of federal constitutional proportions." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). Rather, Defendants Allen's and Magon's actions were isolated incidents that did not involve any touching of Plaintiff's body. As such, Defendants' conduct did not violate the Eighth Amendment.

Further, that the search of Plaintiff—or the failure of the officers to submit an incident report of the search—might have violated IDOC policy does not give rise to a constitutional violation. (*See* Pl. Consol. Memo. at 14-15.) So long as prison officials' conduct does not violate the Constitution, a prison need not comply with its "own, more generous procedures" in order to avoid liability under § 1983. *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

For the foregoing reasons, Defendants Allen and Magon are entitled to summary judgment.

**C.**     *Defendants Corizon, Cardona, and Siegert Are Entitled to Summary Judgment on Plaintiff's Medical Treatment Claims*

Plaintiff claims that Corizon, Cardona, and Siegert violated her Eighth Amendment right to adequate medical treatment by not providing Plaintiff with specific, medically necessary bras and underwear to accommodate her growing breasts and to treat her testicular pain.

      i.    <u>Factual Background</u>

      a.    *Underwear Issue*

During an altercation with a prison employee in 2000—an incident unrelated to Plaintiff's current claims—Plaintiff's right testicle was injured. According to Plaintiff, she continues to suffer testicular pain as a result of that injury. Plaintiff states that the seams of the ordinary, prison-issued underwear tug and pull on her testicle, causing substantial pain. (Pl. Consol. Memo. at 41.) In 2003, urologist Dr. Tullio Celano prescribed anti-inflammatories for Plaintiff's pain, concluding that Plaintiff might have had a "necrotic appendix epididymis" that "had not grown to significant size"; alternatively, the urologist believed Plaintiff might have had a cyst. (Ex. A. to Valley Aff., ICC Stover 348, Dkt. 124-13 at 16.) From 2004 to 2009, while incarcerated at other prison facilities, Plaintiff tried various types of underwear and found that seamless underwear "seemed to work the best" and caused her less pain than the ordinary, seamed

underwear.[5] (Stover Depo. at 32-33.) Plaintiff was transferred back to ICC in July 2009. (*Id*. at 33.)

On January 20, 2010, while she was incarcerated at ICC, Plaintiff was evaluated by P.A. Daniel Lambert for testicular pain. (Ex. 1 to Joseph Valley Aff., Dkt. 124-13 at 3, ICC Stover 221.) Lambert ordered Plaintiff three pairs of men's "speedo type briefs – seamless," with a refill to be ordered in 6 months. (*Id*.) A week later, Plaintiff received three pairs of seamless briefs in accordance with Lambert's order, and when they wore out she was given two more pairs of seamless briefs. (Pl. Consol. Memo. at 41; Stover Depo. at 21.)

Plaintiff acknowledges that she had "the special seamless underwear for about a year"—the entire time she remained at ICC. (*Id*. at 21-22.) However, Plaintiff claims that these newer pairs of seamless underwear also wore out and became loose during that one-year period. Therefore, on July 17, 2010, Plaintiff met with Defendant Cardona, the Health Services Administrator, to discuss Plaintiff's request for more replacement briefs. Cardona told Plaintiff that the briefs would not be reordered, despite P.A. Lambert's order for a refill in six months. (Stover Depo. at 25-26.) On July 26, 2010, Plaintiff

---

[5]     Plaintiff alleged in her Amended Complaint that she was promised seamless underwear as part of a court order or settlement of the altercation in 2000 (Dkt. 10 at ¶ 262), but she has not pointed the Court to any such order or settlement agreement in the record. Although there was a lawsuit regarding the altercation, which was settled in 2005 (Dkt. 123-2 at 3 n.3), the record does not contain any evidence that seamless underwear was an issue in that settlement. Thus, there is no evidence to support Plaintiff's implication that she is specifically entitled to *seamless* underwear as part of a legally enforceable document (as opposed to simply *medically-necessary* underwear). Rather, as Plaintiff stated in her deposition, the settlement agreement was that CCA would bear the cost of any medical treatment related to Plaintiff's testicular injury. (Stover Depo. at 113.)

**MEMORANDUM DECISION AND ORDER - 26**

renewed her request, this time to P.A. Lambert, for five new pairs of seamless underwear. (Ex. A to Valley Aff., ICC Stover 229, Dkt. 124-13 at 6.) Lambert examined Plaintiff and noted that she had a "very small . . . hydrocele" in her right testicle. (*Id.*) Lambert's notes state that he could "acquire 1 pk of briefs" for Plaintiff, but asked Plaintiff for the name of her original urologist so that Lambert could consider whether Plaintiff's requests were consistent with her medical needs. (*Id.*)

Although Plaintiff states that Lambert told her that she would receive this new underwear in a few days (Pl. Consol. Memo. at 41), it does not appear that the extra pair of briefs was ordered or that Lambert was able to speak with Plaintiff's previous urologist about her potential need for seamless underwear. Plaintiff claims that she was informed by P.A. Lambert that Defendant Cardona had cancelled Lambert's order for seamless underwear. (Stover Depo. at 21.) Plaintiff has not submitted a declaration from Lambert supporting this allegation. On July 31, 2010, Defendant Cardona left his employment with CCA.

Plaintiff filed a grievance on the underwear issue on August 9, 2010. (Ex. 2 to Stover Depo. and Ex. A. to Williams Decl., ICC Stover 5, Dkt. 123-5 at 30.) Although Defendant Cardona's name was apparently automatically generated and was listed as the "Level 1 Responder" on the grievance, it is clear from the response that Acel K. Thacker—the new Health Services Administrator—was the person who actually responded. (*Id.*) Cardona was no longer working at ICC when the grievance was filed.

Thacker denied the grievance, stating that Plaintiff did "not have a medical condition that requires the use of a specific brand or kind of brief," that Lambert's request for the name of Plaintiff's urologist was "completely legitimate," and that Plaintiff would be "provided with the kinds and types of underwear allowed by the institution as well as . . . the necessary medications and treatments that are customarily provided in the community for your medical condition." (*Id.*)

Plaintiff was examined by Dr. Stander on September 29, 2010. Dr. Stander noted that the hydrocele in Plaintiff's right testicle was small: "[Plaintiff] says it has enlarged but it still feels small to me." (Ex. A to Valley Aff., ICC Stover 228, Dkt. 124-13 at 5.) Plaintiff again requested new underwear, but it does not appear that Dr. Stander agreed to Plaintiff's request.

On December 30, 2010, Plaintiff was transferred from ICC to ISCI, and she took three pairs of seamless underwear (which Plaintiff claimed were worn out) with her. Stover Depo. at 106-07.) Upon Plaintiff's transfer to ISCI, Defendant Corizon took over her medical treatment.

On January 17, 2011, Plaintiff filled out a refill request for three pair of "Mens Bikini underware [sic] size S/CH Style 'Life' 100% cotton[,] Styled by Jockey." (Stover Depo. Ex. 5, Dkt. 123-5 at 34.) However, there is no staff signature on the request acknowledging receipt; therefore, it is unclear whether this request was received by medical staff or, if it was received, who received it.

Other than this refill request—which might or might not have been received by medical staff—Plaintiff did not notify any medical staff member about an underwear issue, nor did she submit a Health Services Request with respect to underwear or otherwise complain of testicular pain, for the first two-and-a-half months after her transfer to ISCI, even though Plaintiff met with medical or mental health providers at least five different times during that period. (Ex. A. to Valley Aff., Stover 318-19, 336-39, 379-83, 938-52.

The first time Plaintiff complained of testicular pain while at ISCI was on March 12, 2011, when she was examined by Dr. Scott Lossmann. Plaintiff told Lossmann that she was entitled to special underwear pursuant to a court order (which, as stated above in note 5, is not supported by the record), that she had tried several types of underwear, and that she wanted "bikini briefs." (Ex. A to Valley Aff., Stover 520, Dkt. 124-6 at 27.) Lossmann informed Plaintiff that Lossmann would need to check with the warden because "the request for special underwear pursuant to an order was extremely unusual." (*Id*.) Lossmann assessed Plaintiff again on March 31, 2011, and told Plaintiff that he was still looking into Plaintiff's request with the warden. (*Id*., Stover 519, Dkt. 124-6 at 26.)

Dr. Lossmann reevaluated Plaintiff on April 19, 2011, noting that he had sent an email to the deputy warden regarding the underwear issue but had not heard back. (Lossmann Aff., Dkt. 124-3, at ¶ 8.) Just over a week later, a different medical provider—Dr. Myung Song—issued an order and an Offender Medical Status Report for five pairs of "Chick Life Jockey Underwear" to be provided to Plaintiff. (Ex. A. to Valley

Aff., Stover 264, Dkt. 124-5 at 20; Stover 967, Dkt. 124-9 at 12.) Plaintiff received five pairs of Fruit of the Loom women's bikini briefs before the end of April. (Stover Depo. at 116-117.) Plaintiff does not contend that the difference in the brand between Dr. Song's order (Jockey) and the underwear Plaintiff received in April (Fruit of the Loom) is relevant to her medical claims.

On August 4, 2011, Plaintiff requested a refill of the briefs ordered by Dr. Song. (Stover Depo. Ex. 5, Dkt. 123-5 at 34.) Five days later, Plaintiff met with non-defendant Rich Cartney and Defendant Siegert to discuss the underwear issue. (Stover Depo. at 121-30.) At this meeting, Plaintiff agreed to try a different type of underwear, made of orange netting. (*Id*. at 124-25.) Plaintiff did so, but decided that this new type of underwear stretched out too much and "didn't work." (*Id*. at 125, 130-31.)

On September 2, 2011, less than a month after the August 4 meeting, Plaintiff was present at a meeting with the members of her Multi-Disciplinary Treatment Team ("MDTT"), which included Judd Roth, Sergeant Winter, Rich Cartney, treating physician Dr. Lossmann, and Defendant Rona Siegert. (Stover Depo. at 131-35; Stover Depo. Ex. 9, Dkt. 123-5 at 40.) As the name implies, MDTT members represent multiple disciplines, and the purpose of forming an MDTT is "to help address and resolve an offender's concerns." (Lossmann Aff., Dkt. 124-3, ¶ 12.) Plaintiff reported her dislike of the underwear with orange netting to the MDTT members, and "shortly thereafter" prison staff provided Plaintiff with the IDOC-issued underwear used at the women's prison.

(Stover Depo. at 26, 131-136.) These are the underwear Plaintiff currently uses, and she has no complaints about them.[6]

>    b.    *Bra Issue*

In addition to Plaintiff's claims regarding the underwear provided to her by CCA at ICC and by Corizon at ISCI, she also asserts that Defendant Corizon and Defendant Siegert—the Health Services Director for the IDOC—violated the Eighth Amendment by failing to ensure that Plaintiff was provided with medically necessary training bras while she was incarcerated at ISCI. (Pl. Consol. Memo. at 42-44.) She claims that the bras initially provided at ISCI restricted her breast growth, caused rashes and bleeding, and were generally very uncomfortable.

As noted previously, Plaintiff has been diagnosed with GID. On April 19, 2011, Dr. Lossmann determined that Plaintiff should begin female hormone therapy and prescribed estrogen treatment for her. Although the hormone treatment would ultimately result in breast growth, Dr. Lossmann has testified that "it was not medically necessary to make an order for a bra on [April 19, 2011] as it takes some time for the hormones to take effect and breasts to be formed." (Lossmann Aff., Dkt. 124-3, at ¶ 9.)

Dr. Lossmann next evaluated Plaintiff on June 20, 2011, after Plaintiff was caught wearing a makeshift bra in violation of prison policy. (*Id*. at ¶ 10.) Dr. Lossmann's notes reflect that Plaintiff's "right breast had started to bud and demonstrated a two centimeter round diameter and that the left side showed only minimal budding." (*Id*.; *see also* Ex. A.

---

[6]    Plaintiff was also able to obtain five pairs of underwear from the commissary in November and December 2011. (Kevin Burnett Aff., Dkt. 126-6 at ¶ 6.) Plaintiff does not argue that these briefs were medically inadequate.

to Valley Aff., Stover 970, Dkt. 124-9 at 15.) At that time, Lossmann mistakenly believed that Corizon medical staff had to order female undergarments for prisoners with GID who are housed in a men's prison;[7] therefore, Lossman noted that he would issue a memorandum for a "support-training" bra for Plaintiff. (Lossmann Aff. at ¶ 10; Ex. A. to Valley Aff., Stover 970, Dkt. 124-9 at 15.) An Offender Medical Status Report issued by Lossmann stated that Plaintiff would be provided a "training bra." (Ex. A. to Valley Aff., Stover 262, Dkt. 124-5 at 18.)

Plaintiff received the bra ordered by Dr. Lossmann one month later, on July 20, 2011. (Stover Depo. Ex. 11, Stover 261, Dkt. 123-5 at 42.) Plaintiff was unhappy with the bra because it was a "sports bra," rather than a "training bra."(Stover Depo. at 144.) Plaintiff believes there is a difference between the two—that a training bra allows for breast growth but a sports bra does not. But according to Dr. Lossmann, there is no *medical* difference between a sports bra, a training bra, and a training-support bra." (Lossmann Aff. at ¶ 11.) In Dr. Lossmann's medical opinion, "none of these bra types would inhibit breast growth." (*Id*.) Plaintiff has acknowledged that she is not an expert in which types of bras, if any, inhibit or restrict breast growth. (Stover Depo. at 148-49.) Plaintiff also believed she should have been issued more than one bra on July 20, 2011, and that the bra she did receive was "real loose." (Stover Depo. at 144.) (*Id*.)

Approximately two weeks after receiving the sports bra, Plaintiff submitted a refill request for five "training bras," size 32, "as Dr. ordered." (Stover Depo. Ex. 5, Dkt. 123-5

---

[7]      In actuality, the IDOC was—and is—able to provide such undergarments directly through the women's prison. (Lossmann Aff. at ¶ 10; Ex. A. to Valley Aff., Stover 970, Dkt. 124-9 at 15.)

at 34.) Plaintiff also filed a grievance regarding the sports bra that she was provided on July 20. On August 9, 2011, Defendant Siegert and Rich Cartney met with Plaintiff to discuss her medical issues. (Rona Siegert Aff., Dkt. 126-12, at ¶ 9.) Plaintiff was informed that she could obtain IDOC-issued female undergarments, including bras, and Plaintiff agreed that she would try them. (*Id*.)

A week later, Plaintiff was offered three size 32 sports bras. She refused to accept them, however, because she believed that sports bras restricted breast growth. (Ex. A to Valley Aff., Stover 260, Dkt. 124-5 at 16; Stover Depo. at 147-48.) Plaintiff thought the sports bras "wouldn't work" and asserts that they caused pain, rashes, and bleeding and "were just plainly uncomfortable." (Stover Depo. at 147-48.)

On August 16, 2011, Dr. Song changed the order for Plaintiff's bras so that Plaintiff would receive only IDOC-issued bras from the women's prison. (Ex. A to Valley Aff., Stover 259, Dkt. 124-5 at 15.) At the September 2, 2011 MDTT meeting, the MDTT agreed to provide Plaintiff with multiple sizes of bras, and arranged for Plaintiff to be measured for the IDOC-issued bras. Plaintiff received several bras from size 32 to size 36, but later notified medical staff that she was not satisfied with them. (Stover Depo. at 169-71.)

On September 21, 2011, Plaintiff was caught with a pair of makeshift "falsies" that she has "manufactured out of an orange piece of material, two latex gloves and what appeared to be mattress stuffing." (Ex. A. to Burnett Aff., Stover 683, Dkt. 126-6, at 17.) These falsies, as well as a makeshift bra, were confiscated by prison staff. (*Id*.)

On November 29, 2011, the MDTT met with Plaintiff again. The following individuals were present: Defendant Siegert, Brian Farris, Luke Kormylo, Judd Roth, Shell Wamble-Fisher, Nurse Sara Goff, Dr. Song, and Health Services Administrator Karen Walker. (*Id*. at Stover 682.) At this meeting, it was confirmed that Plaintiff had access to five IDOC-issued or commissary-issued bras. (Ex. A. to Valley Aff., Stover 976, Dkt. 124-10 at 3.) Plaintiff complained that the IDOC-issued bras were too wide and caused itching and bleeding at her underarms. (*Id*.)

At a medical evaluation on December 5, 2011, Dr. Song noted that Plaintiff had "scattered follicular excoriations" on her skin, but that these excoriations did not exhibit any type of pattern from a bra. (*Id*. at Stover 988, Dkt. 124-10 at 14.) Dr. Song prescribed hydrocortisone to treat this rash. (*Id*. at Stover 989, Dkt. 124-10 at 15.) Dr. Song also told Plaintiff she needed a bra with more support on the bottom to "hold it down and keep it from riding up." (*Id*.) Dr. Song emphasized to Plaintiff, however, that she would have to wear IDOC-issued bras, and that bras are, in general, not comfortable items of clothing. (*Id*.)

Plaintiff currently continues to wear these IDOC-issued bras. She testified in her deposition that these bras are sufficient, but that she personally believes they restrict her breast growth. No medical provider has determined that Plaintiff's belief is correct and that any bra issued to Plaintiff restricted her breast growth. (Stover Depo. at 172-74.)

ii.    <u>Standard of Law and Discussion</u>

The protections of the Eighth Amendment include the right to minimally adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In the medical context, a conclusion that a defendant acted with deliberate indifference, for purposes of the subjective prong of the Eighth Amendment standard, requires that the plaintiff show both "a purposeful act or failure to respond to a prisoner's

pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Non-medical prison personnel are generally entitled to rely on the opinions of medical professionals with respect to the medical treatment of an inmate. However, if "a reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986; *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the

prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration

omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of

action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th

Cir. 1980) (per curiam). A delay in treatment does not constitute a violation of the Eighth

Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. If

medical personnel have been "consistently responsive to [the inmate's] medical needs,"

and there has been no showing that the medical personnel had "subjective knowledge and

conscious disregard of a substantial risk of serious injury," summary judgment is

appropriate. *Toguchi*, 391 F.3d at 1061.

a.      *Medical Care Claims against Cardona and Siegert*

Plaintiff alleges that Defendant Cardona was deliberately indifferent to Plaintiff's

medical need for seamless underwear. However, the evidence in the record establishes

very little contact between Plaintiff and Cardona with respect to Plaintiff's medical

treatment claims.

Plaintiff met with Cardona in person on July 17, 2010, but the only information in

the record about this meeting is Plaintiff's statement that Cardona informed her she

would not be receiving any new pairs of seamless underwear. (Stover Depo. at 25-26.)

Cardona made this decision even though P.A. Lambert had ordered a refill of underwear for Plaintiff in six months.[8]

However, there is nothing in the record to support a reasonable conclusion that not having brand new underwear after only six months, even if the current underwear were loose and caused some discomfort, meets any recognized definition of cruel and unusual punishment under the Eighth Amendment. There is no evidence that the "loose" underwear were no longer functional. The Eighth Amendment is concerned with prison conditions that pose a substantial risk of serious harm and with deprivations of an inmate's minimal civilized measure of life's necessities. *Farmer*, 511 U.S. at 834 (1994). It is not concerned with the routine discomforts of prison life.

Further, even if Plaintiff was able to establish the objective prong of the Eighth Amendment analysis, there is nothing in the record supporting an inference that Cardona was *subjectively* aware of a substantial risk of serious harm to Plaintiff if she did not receive new pairs of underwear in July 2010. Rather, the record shows that Cardona either disagreed with P.A. Lambert's order for new underwear or that he did not share Plaintiff's belief that her current briefs were too loose. Plaintiff cannot establish that Cardona deliberately disregarded a substantial risk to a serious medical need in determining that Plaintiff did not require new pairs of a specific type of underwear after only six months.

---

[8]     Plaintiff recognized in her deposition that she did, indeed, receive two pairs of replacement briefs *prior* to July 2010. It appears that these "refills" were simply provided to her sometime earlier than P.A. Lambert had ordered.

Plaintiff also claims that she corresponded with Defendant Cardona on three occasions. (Pl. Consol. Memo. at 42.) First, on July 19, 2010, Plaintiff purportedly sent a letter to Cardona regarding her medical care. (July 19, 2010 Letter, Ex. 12 to Stover Decl., Dkt. 141.) However, this letter discussed Plaintiff's dizzy spells and vomiting, *not* Plaintiff's request for seamless briefs. (*Id*.) Second, Plaintiff purportedly sent another letter on August 1, 2010, complaining about her need for replacement briefs. (August 1, 2010 Letter, Ex. 12 to Stover Decl., Dkt. 141.) Third, on August 23, 2010, Plaintiff purportedly sent a letter that was virtually identical to the August 1 letter. (August 23, 2010 Letter, Ex. 12 to Stover Decl., Dkt. 141.) Though Plaintiff states that she sent these letters to Cardona, the second and third of these letters were addressed to the "Health Service Administrator" for the "ICC Medical Department"—not specifically to Cardona. Cardona himself would not have received these letters, as he was no longer working at ICC as of July 31, 2010. (Dkt. 123-6.) None of these letters creates a reasonable inference that Defendant Cardona was aware of, yet deliberately disregarded, a substantial risk to Plaintiff's health with respect to testicular pain.

Plaintiff also states that non-defendant Acel Thacker denied her grievance on the underwear issue *on behalf of* Defendant Cardona. (Stover Depo. at 24-25; Pl. Consol. Memo. at 42.) But simply because Defendant Cardona's name was printed on the grievance response, which was electronically generated, does not mean that Thacker was acting on Cardona's behalf when he denied the grievance—particularly in light of the fact that Cardona was no longer working at ICC when the grievance was filed.

Further, the explanation for the denial of Plaintiff's grievance was that Plaintiff did not have a medical condition that required the seamless underwear. Plaintiff simply disagrees with this conclusion, which is insufficient to prevail on an Eighth Amendment claim. *Sanchez*, 891 F.2d at 242. P.A. Lambert ordered three pairs of seamless underwear for Plaintiff in January 2010, with one refill. (Ex. 1 to Joseph Valley Aff., ICC Stover 221, Dkt. 124-13 at 3.) And Plaintiff received precisely that—three pairs of briefs in January, and later two more pairs, although these replacements were provided prior to the six-month period Lambert had outlined in his orders. (Pl. Consol. Memo. at 41; Stover Depo. at 21.) When Plaintiff requested yet more briefs in July 2010, Lambert decided that he should consult with a urologist before ordering any more replacement briefs and asked Plaintiff for her urologist's name. (Ex. A to Valley Aff., ICC Stover 229, Dkt. 124-13 at 6.) That Lambert might not have consulted with the urologist does not mean that *Cardona* acted with deliberate indifference.

Moreover, Plaintiff recognizes that she was in possession of seamless underwear from January 2010—only a week after she complained of testicular pain—until she was transferred from ICC to ISCI in December 2010. (Stover Depo. at 21-22.) That Plaintiff believes the briefs were so loose that she needed replacement underwear does not establish that Cardona violated the Eighth Amendment in deciding otherwise. There is simply nothing in the record tending to show that Cardona's decision not to allow further replacement briefs "was medically unacceptable under the circumstances" or was made

"in conscious disregard of an excessive risk" to Plaintiff's medical needs. *Toguchi*, 391 F.3d at 1058 (internal quotation marks omitted).

Plaintiff does not have a constitutional right to a specific treatment. Indeed, under the Eighth Amendment, Plaintiff "is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). It is clear from the record that Plaintiff received such reasonable measures with respect to the underwear issue.

Plaintiff's claims against Defendant Siegert with respect to the bra issue fare no better. According to Plaintiff, the sports bra provided at ISCI "caused her breast to become deformed by growing out left and right rather than straight." (Stover Decl. at ¶ 95.) She claims that a training bra would not have caused this deformity. Plaintiff also asserts that, in addition to restricting her breast growth, the bras caused rashes and bleeding. However, as Plaintiff acknowledged, she is not an expert in such matters. (Stover Depo. at 148-49, 172.)

Dr. Lossmann has provided uncontroverted medical testimony that none of the bras that Plaintiff was provided in prison would restrict her breast growth, and when Plaintiff developed a rash, she was treated for it. (Lossmann Aff. at ¶ 11.) Moreover, Plaintiff cannot establish that the bra actually caused the rash, as the rash did not fit the pattern of the bra. There is simply nothing in the record to support Plaintiff's personal belief that the bras provided by Corizon employees or by the IDOC restricted her breast

growth or caused any deformity or other significant problem—other than the wholly unremarkable fact that bras are not the most comfortable of undergarments.

In addition to there being no evidence that the bras actually restricted Plaintiff's breast growth or caused any deformity, there is similarly no evidence that Defendant Siegert was aware of, yet disregarded, a substantial risk to Plaintiff's health at any time during Plaintiff's medical treatment. Siegert met with Plaintiff on several occasions to discuss both the underwear and bra issues. The entire MDTT consistently tried to work with Plaintiff to find appropriate undergarments, and they eventually succeeded. That Plaintiff was not entirely happy with the undergarments she previously received does not mean that Defendant Siegert acted with deliberate indifference.

For these reasons, Defendants Cardona and Siegert are entitled to summary judgment on Plaintiff's medical treatment claims.

> b.  *Medical Care Policy Claims against Corizon*

Plaintiff also claims that Corizon violated the Eighth Amendment with respect to the underwear and bra issues. However, the only claim against Corizon upon which Plaintiff was allowed to proceed was based on Plaintiff's allegation that Defendant Siegert was a Corizon employee. (Initial Review Order, Dkt. 16 at 16.) Because of that allegation, Plaintiff's Amended Complaint raised a plausible inference that Siegert was a Corizon official "with final policy-making authority" for purposes of a *Monell* policy claim. *Clouthier*, 591 F.3d at 1250. (*See also* Dkt. 16 at 16.) However, Corizon has met their burden of showing that Siegert was *not* a Corizon employee; rather, she worked for

IDOC. Plaintiff has not raised a genuine dispute as to Siegert's employment. Therefore, Siegert's decision to deny Plaintiff's request for a specific type of bra or underwear cannot be imputed to Corizon.

Plaintiff now attempts to assert another *Monell* claim: that Corizon had a policy or custom of treating all transgendered inmates the same, rather than "independently on a case by case basis." (Stover Stmt. of Facts, Dkt. 141-2 at ¶ 28.) Plaintiff asserts that Corizon's individual medical providers "are not permitted by Corizon to provide treatment that is not consistent with their 'one treatment fits all' policy." (*Id.*)

Aside from the fact that Plaintiff did not include this claim in her Amended Complaint, the evidence in the record plainly refutes Plaintiff's allegations of a one-size-fits-all medical treatment policy for inmates with GID. Plaintiff had her own Multiple Disciplinary Treatment Team, the sole purpose of which was to manage her medical and mental health treatment. The team members met with Plaintiff several times, listened to her concerns, and addressed them. Plaintiff has met with various medical and mental health care providers on many occasions while incarcerated at ISCI. (*See, e.g.*, Lossmann Aff., Dkt. 124-3; Ex. A to Valley Aff.; Siegert Aff., Dkt. 126-12.) Corizon's employees consistently attempted to ensure that Plaintiff was provided with appropriate medical treatment. These facts demonstrate unequivocally that there is no one-size-fits-all policy with respect to inmates diagnosed with GID.

Therefore, Defendant Corizon is entitled to summary judgment on Plaintiff's medical treatment claims.

4. **Defendants Romreill, Kirkman, and Wamble-Fisher Are Entitled to Summary Judgment on Plaintiff's Free Exercise of Religion Claims, but Defendants Kirkman and Wamble-Fisher Are *Not* Entitled to Summary Judgment on Plaintiff' RLUIPA Claims Regarding the Sweating Ceremony**

Plaintiff claims that Defendants Romreill, Kirkman, and Wamble-Fisher violated Plaintiff's religious rights under the Constitution and federal statute by belatedly providing her with a smudge stick so she could participate in a religious smudging ceremony at ISCI. Plaintiff also claims that Defendants Kirkman and Wamble-Fisher violated Plaintiff's religious rights by not allowing her to use the ISCI sweat lodge to participate in a religious sweating ceremony.

A. *Factual Background*

Plaintiff follows Native American religious beliefs. In early 2011, shortly after Plaintiff's transfer to ISCI, Plaintiff informed Defendant Wamble-Fisher—who at that time was the Deputy Warden of Operations—that Plaintiff would like to participate in Native American religious practices. (Wamble-Fisher Aff., Dkt. 126-7, at ¶ 6.) Plaintiff and Wamble-Fisher met to discuss the issue.

One of the ceremonies Plaintiff wished to practice was a sweating ceremony. This ceremony takes place inside a sweat lodge and "involves an open fire in a fire pit located outside of the building." (Kirkman Aff. at ¶ 8.) The fire heats up rocks, which are then taken into the lodge for water to be poured over them. This creates steam, which causes the inmates to sweat. Portions of the sweating ceremony are performed by inmates inside the lodge and out of view of prison staff. (*Id.*) ISCI, which is a men's prison, has one sweat lodge utilized by the male inmates wishing to practice the sweating ceremony.

According to Wamble-Fisher, Plaintiff understood that, as a result of Plaintiff's self-identification as a female, it would be unsafe for her to use the sweat lodge in the company of the male inmates; Plaintiff agreed that smudging in her cell was a reasonable alternative to sweating. (Wamble-Fisher Aff. at ¶ 6.) Plaintiff disputes this, stating that Wamble-Fisher "never discussed any safety concerns related to the Plaintiff's practicing her religious ceremonies." (Pl. Consol. Memo. at 21.) Plaintiff and Wamble-Fisher agree that at this meeting, they discussed "options available to [Plaintiff] as a protective custody inmate in ISCI's Behavioral Health Unit." (Wamble-Fisher Aff. at ¶ 6; Pl. Consol. Memo. at 21.) Plaintiff does not dispute that she informed Wamble-Fisher at that point in time that being allowed to smudge in her cell was a reasonable and acceptable alternative to using the sweat lodge.

Smudging involves the burning of a smudge stick, which is a bundle of herbs wrapped together. (Kirkman Aff., Dkt. 126-8, at ¶ 7.) Wamble-Fisher has testified that she instructed Plaintiff to send a concern form regarding smudging to Defendant Kirkman—the IDOC's Volunteer and Religious Coordinator—as required by IDOC policy. (Wamble-Fisher Aff. at ¶ 6.) Plaintiff states, however, that Wamble-Fisher told Plaintiff that Wamble-Fisher would issue a memo so that Plaintiff could smudge in her cell.

In February 2011, Plaintiff informed a psychiatric technician that she desired to smudge. (Am. Compl. ¶¶ 424-25; Wamble-Fisher Aff., Dkt. 126-7, at ¶ 7.) Defendant Wamble-Fisher was later notified of Plaintiff's request. (Wamble-Fisher Aff. at ¶ 7.)

Plaintiff did not submit a written request to smudge as required by IDOC policy.[9]

Nonetheless, on March 21, 2011, Defendant Kirkman met with Plaintiff to discuss her desire to smudge. (Kirkman Aff. at ¶¶ 3-5, 10.)

According to Kirkman, Plaintiff again agreed that being allowed to smudge in her Unit or in the recreation yard was a reasonable alternative to sweating. (*Id*. at ¶ 11.) Plaintiff told Kirkman that smudging once per week was acceptable, though she would prefer to smudge twice per week, specifically on Tuesdays and Thursdays. Kirkman told Plaintiff that she would be allowed to smudge at least once per week, but that she could smudge more often if the staff in her unit agreed. (*Id*.)

Kirkman also informed Plaintiff that she would be responsible for the cost of her smudge sticks. Kirkman avers that Plaintiff offered to contact her reservation in Oklahoma to obtain a smudge stick, while Plaintiff states that she did so only after Kirkman refused to provide one. (*Id*.; Pl. Consol. Memo. at 22.) However, Plaintiff does not contend that the prison was required to furnish her with a smudge stick at the government's expense. In any event, the reservation in Oklahoma did not provide Plaintiff with a smudge stick.

---

[9]     According to IDOC policy, an inmate wishes to practice a "new or unfamiliar religious activity" was required to send a concern form to the Volunteer and Religious Coordinator. (Kirkman Aff. at ¶ 4 and Ex. A.) Plaintiff claims that she was not required to submit a written request to smudge because smudging is a well-known part of Native American religious practices and is not new or unfamiliar to prison officials. (Pl. Consol. Memo. at 20-21.) However, Plaintiff ignores the fact that, because she had not previously smudged at ISCI, *her* practice of such a ceremony was indeed "new." Thus, IDOC policy required her to submit a written request.

Kirkman prepared a memo regarding Plaintiff's smudging on April 27, 2011, approximately five weeks after the March 21 meeting. The memo allowed Plaintiff to smudge "at least on Tuesdays and Thursdays," which was more often that Kirkman initially agreed, "after soft count and while the offender is alone." (Ex. B to Kirkman Aff.) The memo also stated that Plaintiff was allowed to keep the smudge stick in her cell as "personal religious property." (*Id*.)

On April 29, 2011, Plaintiff asked Kirkman to provide her with a smudge stick because she had not heard back from the reservation in Oklahoma. (Kirkman Aff. at ¶ 19.) Kirkman obtained a smudge stick on May 11, 2011, less than two weeks later. Kirkman informed Plaintiff that he was in possession of the smudge stick but was "working on the issue of how to light it." (*Id*.) Kirkman met with the prison's Religious Activities Oversight Committee, which determined that matches would be used to light the smudge stick. (*Id*. at ¶ 20.) The memo allowing Plaintiff to smudge, the smudge stick, and the matches were provided to Plaintiff's housing unit on or before May 24, 2011, approximately two months after the March 21 meeting.

On May 26, 2011, Plaintiff approached Defendant Romreill and asked for the smudge stick. Romreill has testified that, at that time, he was unsure whether Plaintiff could keep the smudge stick with her. (Romreill Decl., Dkt. 126-11, at ¶ 6.) Plaintiff informed Romreill, correctly, that there was a memo that allowed her to keep the smudge stick with her as religious property. (Pl. Consol. Memo. at 22.) Plaintiff was frustrated

with Romreill's statement that he would need to check with another official, so she stormed off without waiting for him to do so. (Stover Depo. at 206.)

Plaintiff received the smudge stick two days later, but the matches would not work to light it. (Romreill Decl. at ¶ 8; Stover Depo. at 206. Plaintiff claims, without citation to any evidence in the record, that Kirkman "purposely sent matches that would not work deliberately to delay Plaintiff's ability to smudge." (Pl. Consol. Memo. at 21-22.) Plaintiff sent a concern form regarding the defective matches, and Kirkman received the form on June 3, 2011. (Kirkman Aff. at ¶ 22.) Kirkman determined that a lighter could be used to light the smudge stick but that, for security reasons, a staff member would light the smudge stick for Plaintiff, and Plaintiff would not be allowed to keep the lighter in her cell. (*Id.*)

The lighter was delivered to unit staff, and Plaintiff was able to smudge no later than the first week of June 2011—approximately five weeks after Plaintiff's written request to Kirkman for a smudge stick on April 29, 2011, and approximately ten weeks after Plaintiff claims she verbally requested a smudge stick on March 21, 2011. (*Id.* at ¶ 23; Romreill Decl. at ¶ 8; Pl. Consol. Memo. at 22.)

Plaintiff considered this delay, as well as the incident with the defective matches, to be unacceptable. Therefore, she informed Defendant Wamble-Fisher that Plaintiff would no longer be satisfied with being allowed to smudge in her cell; instead, Plaintiff stated that she was seeking the ability to practice "full ceremonial rights, including sweat, smudging and Pipe ceremonial rites." (Am. Compl. at ¶ 441.)

Defendant Kirkman denied Plaintiff's request to sweat, citing safety and staffing concerns. (*Id.* at ¶ 443; *see also* Stover Decl. at 3.) In June 2011, Plaintiff filed a grievance challenging the denial of her request to sweat. On July 5, 2011, Kirkman responded:

> Offenders in general population have access to the sweat lodge. There is no least restrictive alternative given the restrictions of a federal court order regarding wood for the fire and heating the rocks and time and staff limitations to have one offender use the sweat lodge. You are allowed to smudge in your unit and have been provided a smudge stick and the means to light it along with a memo for staff outlining the authorization and procedure.

(Ex. 38 to Stover Decl., Dkt. 141.) A deputy warden reviewed Kirkman's response and added that given Plaintiff's "circumstances," she "would not be safe to sweat with" the general population inmates." (*Id.*) The deputy warden continued, "Our staffing pattern does not permit us to take you out to the lodge and sweat individually. You will have to practice your religion in your cell or recreation area . . . ." (*Id.*)

Plaintiff states that at the time she requested the opportunity to sweat, a chaplain at ISCI, Boyd Chikatula, "volunteered to escort [Plaintiff] to the sweat lodge, after the male Native Americans were finished sweating." (Stover Decl. at 3.) Plaintiff claims that this plan would have allowed her to use the sweat lodge by herself, without placing additional burdens on prison staff, but that the plan "was never implemented." (*Id.*) [10]

---

[10] Plaintiff also claims that her religious rights are being violated because she "has not been able to perform any of her religious ceremonies since August 13, 2013." (Pl. Consol. Memo. at 22.) These allegations are much too vague to proceed, and, in any event, the instant lawsuit involves claims that arose on or before October 2, 2012, the date Plaintiff signed her Amended Complaint. (*See* Dkt. 10.) Although these allegations could potentially be the subject of a future

B.    ***Standard of Law and Discussion***

　　i.    <u>Plaintiff's First Amendment Claims</u>

The First Amendment Free Exercise Clause absolutely protects the right to believe in a religion; it does not absolutely protect all conduct associated with a religion. *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940). Inmates retain their free exercise of religion rights in prison. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). An inmate who is an adherent of a minority religion must be afforded a "reasonable opportunity of pursuing [her] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). A prison need not, however, provide "identical facilities or personnel" for "every religious sect or group within a prison." Further, a "special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Id.* at 322 n.2.

To serve as a basis for a viable claim challenging a prison restriction under the Free Exercise Clause, an inmate's belief must be both sincerely held and rooted in religious belief. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008); *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). However, *de minimis*—or minor—burdens on the free exercise of religion are not of a constitutional dimension, even if the belief upon which the exercise is based is sincerely held and rooted in religious belief. *See, e.g.*, *Rapier v.*

---

lawsuit, the parties are encouraged—when they meet in settlement conference with respect to this action—to make every effort to discuss, resolve, and settle any similar future claims in order to alleviate the necessity for a new lawsuit.

**MEMORANDUM DECISION AND ORDER - 50**

*Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (the unavailability of a non-pork tray for

inmate at 3 meals out of 810 does not constitute more than a *de minimis* burden on

inmate's free exercise of religion). Similarly, a prison's occasional failure to

accommodate a religious practice does not violate the Free Exercise Clause where there

is no evidence that the failures were caused by "anything other than institutional

shortage." *Id.*

      Challenges to prison restrictions that are alleged "to inhibit First Amendment

interests must be analyzed in terms of the legitimate policies and goals of the corrections

system, to whose custody and care the prisoner has been committed in accordance with

due process of law." *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 125 (1977) (citation

omitted). What constitutes a reasonable opportunity for religious exercise, therefore, must

be evaluated within the context of a prison's need for security, among other legitimate

goals. *O'Lone*, 482 U.S. at 350-53 (1987) (holding that a prison's policy of not allowing

Muslim inmates on work detail to return to the prison to attend Jumu'ah, a group worship

service, did not violate the Constitution).

      As long as a restriction on an inmate's religious practice "is reasonably related to

legitimate penological interests," that restriction is valid. *Turner v. Safley*, 482 U.S. 78,

89 (1987). Factors to be considered in this reasonableness inquiry include (1) whether

there is a logical connection between the governmental interest and the particular policy

or decision at issue; (2) whether "alternative means of exercising the right remain open to

prison inmates"; (3) the impact that accommodating a prisoner's religious practice would

have on "other inmates, on prison personnel, [or] on allocation of prison resources generally," *O'Lone*, 482 U.S. at 50-52 (internal quotation marks and alterations omitted); and (4) whether there is an absence of ready alternatives, which constitutes "evidence of the reasonableness of a prison regulation," *Turner*, 582 U.S. at 90.

a.     *Smudging Ceremony – First Amendment*

Defendant Romreill has met his burden of showing that the two-day delay[11] allegedly caused by Romreill when Plaintiff first asked him for the smudge stick in her housing unit is nothing more than a *de minimis* burden on the exercise of Plaintiff's religious beliefs. Because Plaintiff has not pointed to any specific facts in the record that would establish otherwise, Defendant Romreill is entitled to summary judgment.

Similarly, Defendants Kirkman and Wamble-Fisher have met their initial burden of showing that the five- to ten-week delay in Plaintiff's receiving a smudge stick and working lighter was only a *de minimis* burden on the exercise of Plaintiff's religious beliefs and, therefore, did not violate the Free Exercise Clause of the First Amendment. Plaintiff did not submit a written request for a smudge stick until April 29, 2011, and by the first week of June she was able to smudge. This is certainly an understandable delay, given that Defendants had to ensure Plaintiff had a safe way to light the smudge stick. Even if Plaintiff's version of the facts is correct and she asked for (and was refused) a smudge stick on March 21, 2011, she does not claim that she offered to pay for the smudge stick or that she was entitled to be given one at no cost to her.

---

[11]     Although Plaintiff could not light the smudge stick when she received it two days after she requested it from Romreill, Plaintiff does not allege that Romreill had anything to do with the defective matches.

**MEMORANDUM DECISION AND ORDER - 52**

Plaintiff has not come forward with any evidence that this brief delay was the result of anything other than ordinary administrative or institutional delay. *See Tapp v. Stanley*, 2008 WL 4934592, at *7 (W.D.N.Y. Nov. 17, 2008) (unpublished) (holding that a 3-month delay in providing a prisoner with a religious meal did not substantially burden the prisoner's sincerely-held religious beliefs where the delay was "caused by ordinary administrative delay"). That the matches initially provided to Plaintiff did not work is of little moment, particularly when Plaintiff was provided with a working lighter to light the smudge stick no more than a week later. There is nothing in the record that even remotely supports Plaintiff's assertion that Defendant Kirkman purposely provided her with matches that did not work.

Plaintiff has not met her burden of raising a genuine dispute of material fact with respect to her First Amendment smudging claims. Therefore, these claims will be dismissed with prejudice.

b.      *Sweating Ceremony – First Amendment*

Defendants have established that denying Plaintiff's request to use the sweat lodge is reasonably related to the legitimate penological interest of ensuring Plaintiff's safety. ISCI has one sweat lodge, and the male inmates are allowed to attend sweating ceremonies in groups. (Kirkman Aff. at ¶ 8.) Sweating involves the inmates removing most of their clothing, and ISCI staff members are not able to observe what happens inside the sweat lodge. (*Id*. at ¶ 29.) Plaintiff is a transgender prisoner with feminine characteristics, and she has already been sexually assaulted several times. An attack in

the sweat lodge by other inmates is entirely possible, and Plaintiff could be severely injured as a result.

Plaintiff has not raised a genuine dispute that keeping her safe is a legitimate governmental interest or that prohibiting her from using the sweat lodge is reasonably related to that interest. Prohibiting Plaintiff from using the sweat lodge is logically connected to the goal of ensuring Plaintiff's safety, because she is a vulnerable prisoner. *See Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir. 1987) (finding a "valid, rational, connection between" legitimate security concerns and prohibiting inmates in disciplinary segregation from using a sweat lodge). The First Amendment does not require prisons to use the least restrictive means in accommodating prisoners' religious requests. *See Jones*, 433 U.S. at 125. Therefore, the prison was not required to allow Plaintiff to use the sweat lodge outside the presence of the male inmates in order to avoid violating the First Amendment. Plaintiff was still allowed to smudge in her cell, which constitutes an "alternative means of exercising" her religious beliefs. *O'Lone*, 482 U.S. at 351.

For all of these reasons, the Court concludes that Defendants Wamble-Fisher and Kirkman are entitled to summary judgment on Plaintiff's First Amendment sweating ceremony claims, and those claims will be dismissed with prejudice.

ii.      Plaintiff's RLUIPA Claims

The First Amendment is not the only source of religious protection within a prison. The RLUIPA provides, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the

burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person[] (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA applies to entities receiving federal financial assistance. *Id*. at (b)(1). By accepting federal funds, however, states do not waive sovereign immunity to suits for money damages under RLUIPA. *Sossamon v. Texas*, 131 S. Ct. 1651, 1655 (2011). Further, although the statute provides for injunctive relief, RLUIPA does not allow for monetary damages against individuals. *Wood v. Yordy*, 753 F.3d 899, 902-04 (9th Cir. 2014).

Under RLUIPA, the inmate bears the initial burden of showing that the governmental action constitutes a substantial burden on the exercise of the inmate's religious beliefs. *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). For an official's action to constitute a substantial burden on an inmate's religious exercise, it "must impose a significantly great restriction or onus upon such exercise." *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). In determining whether an inmate's religious exercise is substantially burdened, a court may not inquire "into whether a particular belief is 'central' to a prisoner's religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (quoting 42 U.S.C. § 2000cc-5(7)(A)). However, "the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Id.*

If the inmate establishes "the prima facie existence" of a substantial burden on the exercise of the inmate's religion, then the burden shifts to prison officials "to prove that [the] substantial burden on [the inmate's] exercise of his religious beliefs is *both* 'in furtherance of a compelling governmental interest' *and* the 'least restrictive means of furthering that compelling governmental interest.'" *Warsoldier*, 418 F.3d at 995 (quoting 42 U.S.C. § 2000cc-1(a); § 2000cc-2(b)).

"The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (internal citations and quotation marks omitted). Prison officials or a state department of correction "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999.

Although RLUIPA is to be construed broadly in favor of protecting an inmate's religious rights, *id*., the statute does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). A prisoner's requests for religious accommodation must not override other significant interests within a prison setting. "Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized

persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 726. In the words of the Supreme Court, "context matters." *Id*. at 723 (quotation marks and alteration omitted).

a.    *Smudging Ceremony – RLUIPA*

Defendants Romreill, Kirkman, and Wamble-Fisher have met their burden of showing that Plaintiff cannot establish that being denied a workable smudge stick for five to ten weeks is a substantial burden on the exercise of Plaintiff's religious beliefs for purposes of an RLUIPA claim. *See Tapp*, 2008 WL 4934592, at *7 ("Plaintiff cannot meet his burden of demonstrating that [the prison's 3-month delay in providing Plaintiff a kosher meal] substantially burdens his sincerely held religious beliefs. . . . [W]here a delay in providing an inmate with a religious diet is brief and caused by ordinary administrative delay, the inmate's religious rights are not violated.") (internal quotation marks omitted); *Garraway v. Lappin*, 2012 WL 959422, at *13 (M.D. Pa. March 21, 2012) (unpublished) (holding that a three- to four-week delay in receiving religious mail, while "undoubtedly a burden," was not a "*substantial* burden" under the Religious Freedom Restoration Act (emphasis added)). Indeed, the Court has already determined that the delay in smudging constituted only a *de minimis* burden on the exercise of Plaintiff's religious beliefs. Therefore, Plaintiff's RLUIPA claims regarding the smudging ceremony will be dismissed with prejudice.

b.    *Sweating Ceremony – RLUIPA*

For purposes of summary judgment, the IDOC Defendants do not dispute that prohibiting Plaintiff from engaging in a sweating ceremony is a substantial burden on Plaintiff's exercise of her Native American religious beliefs. (IDOC Def. Memo., Dkt. 126-1 at 13.) Therefore, to prevail on their Motion, Defendants Kirkman and Wamble-Fisher must demonstrate that no genuine factual dispute exists that completely denying Plaintiff the opportunity to sweat is in furtherance of a compelling governmental interest and is the least restrictive means of achieving that interest.

The IDOC Defendants offer two explanations for their decision to prohibit Plaintiff from using the sweat lodge to practice her religion. First, they argue that prohibiting Plaintiff from using the lodge is necessary to ensure her safety. The Court does not doubt that prohibiting Plaintiff from using the sweat lodge in the company of male inmates is justified by the compelling governmental interest of keeping Plaintiff safe from physical or sexual assault. As explained above, inmates are generally not fully clothed in the sweat lodge, and prison staff cannot observe the inside of the lodge. Plaintiff has already been a victim of several sexual assaults in prison. As a transgender prisoner with feminine characteristics such as breasts, Plaintiff would be in serious and immediate danger if she were to sweat with the male inmates in the sweat lodge at the men's prison in which she is confined. Ensuring a vulnerable prisoner's safety is obviously a compelling governmental interest.

However, the question remains whether *never* allowing Plaintiff to use the sweat lodge—even by herself or in the presence of the chaplain who volunteered to escort her—is the least restrictive means of keeping Plaintiff safe from attack by other inmates. The IDOC Defendants do not adequately address Plaintiff's allegation that a volunteer chaplain was willing to escort her to and from the sweat lodge, which would presumably not require any changes to ISCI's staffing pattern. They do not offer evidence that allowing Plaintiff to use the sweat lodge with the chaplain would so greatly burden prison staff and other resources that completely denying her request to use the lodge can reasonably be considered the least restrictive means of keeping Plaintiff safe; rather, it appears that allowing Plaintiff's alternative plan might well be less restrictive. Additionally, Defendants Wamble-Fisher and Kirkman have provided no evidence that they "actually considered and rejected the efficacy" of allowing Plaintiff to be escorted by the chaplain before they denied Plaintiff the opportunity to use the sweat lodge outside the presence of male inmates. *Warsoldier*, 418 F.3d at 999.

Instead, the IDOC Defendants point to their second asserted justification for their decision to deny Plaintiff's request to sweat. They argue that the religious beliefs of the other inmates, who use the only sweat lodge at ISCI, would be violated by allowing Plaintiff to enter the sweat lodge *at any time*, even by herself. Defendants Wamble-Fisher and Kirkman both state, in general, that "some Native American tribes believe that allowing a two-spirited person (an individual suffering from gender identify disorder or gender dysphoria) to enter a sweat lodge utilized by single-spirited individuals would

desecrate the religious sanctity of the lodge." (Wamble-Fisher Aff. at ¶ 8; *see also* Kirkman Aff. at ¶ 8.) Therefore, they argue, their decision to prohibit Plaintiff from ever using the sweat lodge—even by herself or in the company of the chaplain who volunteered to escort her—was justified by the compelling penological interest of not burdening the religious practices of other inmates who wish to use the sweat lodge.

After careful consideration, the Court concludes that Defendants have not establish that burdening one individual's religious practice in an attempt to avoid burdening another's religious practice is a compelling governmental interest under RLUIPA. In *Brown ex rel. Indigenous Inmates at N.D. State Prison v. Schuetzle*, a group of Native American prisoners challenged, under the First Amendment and RLUIPA, a prison policy that allowed all inmates—no matter their race or ethnicity—to use the sweat lodge for religious purposes. 368 F. Supp. 2d 1009, 1014-15 (D.N.D. 2005). The court granted summary judgment to prison authorities, concluding that a policy prohibiting non-Natives from attending the sweat lodge ceremony "would offend the fundamental constitutional right to practice religion of one's own choice whether Native American or non-Native American." *Id.* at 1024. The Court is persuaded that government officials cannot avoid Plaintiff's RLUIPA claim merely by citing other inmates' religious concerns, particularly where, as here, the asserted justification is based on mere speculation as to what some other inmates might find religiously objectionable.

Based on the foregoing, Defendants Wamble-Fisher and Kirkman have failed to meet their burden of showing that prohibiting Plaintiff from *ever* using the sweat lodge is

*both* justified by a compelling governmental interest *and* is the least restrictive means of furthering that interest.[12] Therefore, the Court will deny the IDOC Defendants' Motion for Summary Judgment on Plaintiff's sweating ceremony claims under RLUIPA.[13]

## CONCLUSION

For the foregoing reasons, summary judgment shall be granted to Defendants on all of Plaintiff's claims *except* the following:

1)   Plaintiff's Eighth Amendment failure-to-protect claims against Defendants ICC, CCA, Kerr, and Wengler; and

2)   Plaintiff's RLUIPA claims for injunctive relief, with respect to Plaintiff's desire to participate in a religious sweating ceremony, against Defendants Kirkman and Wamble-Fisher.

---

[12]   Because the RLUIPA does not allow for a damages award, *Wood*, 753 F.3d at 903-04, only Plaintiff's injunctive relief claims with respect to the sweating ceremony survive summary judgment. Therefore, the Court need not address Defendants Wamble-Fisher's and Kirkman's argument that they are entitled to qualified immunity on Plaintiff's RLUIPA claims. *See Brown v. Or. Dep't of Corrs.*, 751 F.3d 983, 990 (9th Cir. 2014) ("Qualified immunity is only an immunity from a suit for money damages, and does not provide immunity from a suit seeking declaratory or injunctive relief." (internal quotation marks omitted)).

[13]   The IDOC Defendants also claim that Plaintiff did not exhaust her claims with respect to her desire to sweat because she did not exhaust a specific request that the prison construct a separate, two-spirited sweat lodge. (Dkt. 126-1 at 9.) However, Defendants do not cite, nor has the Court found, any case standing for the proposition that in order to exhaust administrative remedies a prisoner must separately exhaust a request for a specific *remedy* that she wishes prison officials to implement, rather than simply notifying prison authorities of the problem— here, Plaintiff being denied the opportunity to sweat. Therefore, the IDOC Defendants' exhaustion argument fails.

# ORDER

**IT IS ORDERED:**

1.     The IDOC Defendants' Motion to Strike (Dkt. 143) is **GRANTED IN PART and DENIED IN PART**. The following documents are STRICKEN from the record: Affidavit of Adree Edmo; Affidavit of Erinn Wright; Affidavit of Amber Renee Brune; Affidavit of David Paul-Whitestorm Hochstetler; Affidavit of Kyle Merrill; Affidavit of David Thieme; and Affidavit of Jeremy Meyer (all contained within Dkt. 141). The Court has not considered any of these documents.

2.     The CCA Defendants' Motion for Summary Judgment (Dkt. 123) is **GRANTED IN PART and DENIED IN PART**. All claims against Defendant Cardona that arose while Cardona was employed by CCA are DISMISSED with prejudice.

3.     Corizon's Motion for Summary Judgment (Dkt. 124) is **GRANTED**. All claims against Defendant Corizon are DISMISSED with prejudice.

4.     The IDOC Defendants' Motion for Summary Judgment (Dkt. 126) is **GRANTED IN PART and DENIED IN PART**. All claims against Defendants Allen, Magon, Romreill, Siegert, as well as all claims against Defendant Cardona that arose while Cardona was employed by the IDOC, are DISMISSED with prejudice. Further, Plaintiff's First Amendment claims—as well as her RLUIPA claims regarding the smudging

ceremony—against Defendants Wamble-Fisher and Kirkman are DISMISSED with prejudice.

5. If Plaintiff and any remaining Defendant (ICC, CCA, Kerr, Wengler, Kirkman, or Wamble-Fisher) are interested in participating in the Court's Alternative Dispute Resolution (ADR) program, they shall file a joint stipulation for referral to a settlement conference **within 14 days** after entry of this Order. If no stipulation is received, the case will be set for trial.

DATED: February 27, 2015

Edward J. Lodge
United States District Judge